**INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, Appellee,**

v.

**NORTHWEST AIRLINES, INC., Appellant.**

**No. 81–1477.**

United States Court of Appeals, Third Circuit.

Argued Nov. 13, 1981.

Decided March 16, 1982.

Carmine A. Iannaccone (argued), Stryker, Tams & Dill, Newark, N. J., for appellant.

Kevin P. Quill (argued), Nolan, Bell & Moore, Newark, N. J., for appellee.

Before SEITZ, Chief Judge, GARTH, Circuit Judge and CAHN, District Judge *.

* Honorable Edward N. Cahn, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

GARTH, Circuit Judge.

The question presented by this appeal is whether jurisdiction exists in a federal district court under Section 2 of the Railway Labor Act, 45 U.S.C. § 152, which would permit the International Association of Machinists & Aerospace Workers, AFL–CIO (IAM) to maintain an action against Northwest Airlines, Inc. (Northwest) for allegedly disciplining employees as a means of undermining IAM as their union representative. Northwest, denying these allegations, contended that the claims presented here by IAM constituted no more than a "minor dispute" which Section 3 of the Railway Labor Act, 45 U.S.C. § 153, commits to resolution by arbitration. Thus, Northwest moved to dismiss IAM's complaint, on the ground that the district court lacked subject matter jurisdiction. The district court denied Northwest's motions, but certified the jurisdictional issue pursuant to 28 U.S.C. § 1292(b).

We hold that since the record does not demonstrate that Northwest had violated Section 2 by attempting to destroy or undermine IAM's representation of its employees, that the dispute involving the disciplinary actions taken by Northwest are "minor" disputes without the jurisdiction of the federal district courts. Thus, we vacate the order of the district court.

## I.

IAM, in a verified complaint, alleged that Northwest has "interferred [sic] in the representation of its employee members of the [IAM] by harassment, threats, survalence [sic], discipline, suspension, and firing of shop stewards and committeemen who were acting on behalf of the [IAM] in performing representational duties." The complaint described one specific incident of harassment by Northwest against IAM shop stewards. According to the complaint, Northwest's Newark District Manager, Milo Matthews, threatened four IAM shop stewards that "he would get them after New Years."

This threat according to IAM, allegedly resulted in the shop stewards resigning their union posts as shop stewards, even though they remained as Northwest employees. The complaint further charged that thereafter the four former shop stewards were discharged and two members of the IAM safety committee were suspended from employment on sham charges of infractions of company rules. Accordingly, the IAM claimed that the discharges and suspensions were motivated by anti-union animus and constituted a pattern of interference, harassment, and coercion in violation of Section 2 of the Railway Labor Act, 45 U.S.C. § 152 Fourth, Eighth and Tenth.

The complaint alleged additional violations of the Act, in that, allegedly, Northwest officials made derogatory statements about IAM, advised employees not to use IAM for grievances, and professed that Northwest did not have to comply with the Act. Furthermore, Northwest allegedly refused to permit "authorized" IAM agents to represent the disciplined employees. IAM asserted that these actions by Northwest also constituted violations of the Section 2.

IAM sought an injunction prohibiting Northwest from interfering with the representation of its employees by IAM, requiring Northwest to "treat with" non-employee representatives of IAM, and prohibiting Northwest from disciplining employees for their activities as IAM representatives. In addition, the complaint sought reinstatement with full back pay for the six disciplined employees.

Northwest, on the other hand, denied that it had violated Section 2 or that its conduct in any way harassed or threatened IAM through its members. It asserted that the only true dispute presented, was whether the discharge and suspensions of the six individuals was for "just cause" under the IAM–Northwest Collective Bargaining Agreement, claiming that the six employees were disciplined solely because they violated work rules and regulations. Such disputes, according to Northwest, are express-

ly reserved by the Act and the Agreement to arbitration.[1]

In support of its motion addressed to the court's jurisdiction, Northwest filed a verified statement of facts which detailed the following circumstances leading to Northwest's discipline of the six employees:

1. On February 16, 1978, Jeffrey Martens was suspended for five days for defacing the interior cabin wall of a Northwest aircraft by drawing a picture of his immediate superior holding a penis.

2. On February 16, 1978, Thomas Petersel was suspended for three days for smoking in a no smoking area of an aircraft while standing beneath a smoke detector. On February 17, 1978, Petersel, while on disciplinary leave, reported for work, and was directed to leave the premises. Petersel refused to heed this direction and threatened a supervisor with physical harm, calling him a "fat fucking fag." As a result of these actions, Northwest discharged Petersel.

3. On February 18, 1978, Gerald McDonnell was discharged for various violations of company rules including making obscene gestures (feigning masturbation) at management officials in full view of passengers and calling his supervisor a "fag" and asking if he "wanted a date with some young boys."

4. On February 22, 1978 Michael Nelson was discharged for failing to cooperate in an investigation concerning apparent sabotage to Northwest aircraft and ground loading equipment, refusing to record his time of arrival at his work location, and engaging in a work slowdown. Previously, Northwest had disciplined Nelson for leaving the premises during work hours. An investigation of these incidents disclosed that on such occasions Nelson left the airport during his shift to visit his paramour.

5. On March 1, 1978 Robert Williams was suspended for three weeks for conduct including: failure to report to work at the start of his shift; unauthorized absence from his work areas on February 18, 1978; making disrespectful and slanderous remarks to management; indicating that he was engaged in a work slowdown; unauthorized absence from work on February 23, 1978; and insubordination resulting from his return to work after being withheld from service indefinitely on February 23, 1978.

6. On March 13, 1978 Michael McCarthy was discharged for punching his immediate supervisor. The supervisor was a fellow member of IAM.

IAM's contentions are found in its verified complaint and in the affidavits submitted with its motions for a temporary restraining order and a preliminary injunction, both of which were denied. None of the particular facts recited above were controverted under oath in any response by IAM.

Pursuant to the procedure provided in Article XII of the Northwest–IAM Collective Bargaining Agreement, the six employees had grieved their discharges and suspensions. After an initial hearing and appeal, their grievances were denied on April 26, 1978. IAM then sought arbitration before the IAM–Northwest System Board of Adjustment in accordance with Article XIII of the Collective Bargaining Agreement. Due to the illness of the neutral member of the System Board, hearings were not scheduled before the Board until September 21 and 22, 1978. In the interim, on May 9, 1978, IAM filed the present action in the

---

1. Northwest points out that under Article IIB of the parties' present contract the IAM agreed that "all employees covered by the agreement shall be covered by company rules, regulations and orders issued by properly designated authorities of the company." (A 34). Article I(B) provides that "no employee covered by this agreement will be interferred [sic] with, restrained, coerced or discriminated against by the company, its officers or agents because of membership in or lawful activity on behalf of the union." (A 33). Article XII(D) of the agreement provides that employees discharged or suspended unjustly shall be reinstated and/or compensated for lost wages.

district court in the district for New Jersey.[2]

On July 8, 1980, Northwest moved "for an Order dismissing the complaint or alternatively granting summary judgment dismissing the complaint for lack of subject matter jurisdiction. . . ." Northwest contended that the Act and the applicable collective bargaining agreement required that the subject matter of the complaint be arbitrated by the NWA–IAM System Board of Adjustment, the exclusive statutory mechanism for resolving the labor disputes alleged by IAM. The district court denied Northwest's motion, but on Northwest's application, certified the jurisdictional issue for interlocutory appeal, which was granted.

## II.

The Railway Labor Act is made applicable to the airline industry by 45 U.S.C. §§ 181–187. *See International Association of Machinists v. Central Airlines*, 372 U.S. 682, 685–89, 83 S.Ct. 956, 958–60, 10 L.Ed.2d 67 (1963). Section 3(i), of the Act, 45 U.S.C. § 153(i) provides that "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions" are to be resolved by the National Adjustment Board after negotiation between the parties fails. Section 204 of the 1936 amendments to the Act, 45 U.S.C. § 184, requires the parties to a collective bargaining agreement in the airline industry to establish a board of adjustment to resolve through arbitration, the grievances and other disputes to which § 153(i) refers.

As contrasted with Section 153(i) disputes, controversies arising under Section 2 which involve representational conflicts, are not committed to the adjustment boards for resolution. Such disputes are governed by 45 U.S.C. § 152, which we discuss *infra* in part II.B.

### A.

■ It is now well-established that Congress intended to commit so-called "minor disputes"—those arising out of grievances or out of the interpretation or application of collective bargaining agreements—to the exclusive jurisdiction of the boards of adjustment established under the Act. *Andrews v. Louisville & Nashville Railroad*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1971).

In this Circuit, *Goclowski v. Penn Cent. Transp. Co.*, 571 F.2d 747 (3d Cir. 1977) unambiguously sets out the differences between minor and major disputes:

The Supreme Court has held that disputes between employees and railroad employers historically have fallen into two classes, "major" and "minor." Major disputes relate to disputes "over the formation of collective agreements or efforts to secure them. They arise when there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Elgin, Joliet & Eastern R.R. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290 [, 89] L.Ed. 1886 (1945); *Baker v. United Transp. Union*, 455 F.2d 149, 154 n. 11 (3d Cir. 1971). Minor disputes, however, "contemplates the existence of a collective agreement already concluded. . . . The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation. . . ." 325 U.S. at 723, 65 S.Ct. at 1290; 455 F.2d at 154, n. 11.

The difference between the two disputes is critical in determining district court jurisdiction. If a dispute is minor, the district court is without jurisdiction, as exclusive jurisdiction is in the National Railroad Adjustment Board, *see Illinois Central R.R. Co. v. Brotherhood R.R. Trainmen*, 398 F.2d 973 (7th Cir. 1968); 45 U.S.C. § 153 First (i) (1970), whereas

---

**2.** Despite the commencement of the court action, IAM reaffirmed the arbitral process by filing formal submissions with the Board as late as August 28, 1978, some three months after its district court complaint had been filed.

if a dispute is major, the court has power to enjoin changes to preserve the status quo, 45 U.S.C. § 156 (1970), and the claim is submitted for voluntary arbitration to the National Mediation Board.

571 F.2d at 754 n. 6. More recently, the Supreme Court emphasized the purposes underlying Congress's commitment of minor disputes to the Board of Adjustment.

Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements. The Adjustment Board was created as a tribunal consisting of workers and management to secure the prompt, orderly and final settlement of grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions. Congress considered it essential to keep these so-called "minor" disputes within the Adjustment Board and out of the courts. (citations omitted).

*Union Pacific R. Co. v. Sheehan,* 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) (per curiam).

**3.** IAM charged Northwest with violations of 45 U.S.C. § 152 Eighth and Tenth as well. The relevant portion of Section 152 Eighth does no more than require that the contract of employment between the carrier and its employees contain the statutory provisions found in other parts of the Act. Since IAM does not claim that any actions of Northwest are contrary to Section 152 Eighth other than those allegedly violative of Sections 152 Third and Fourth, we need not specifically address any violation of Section 152 Eighth.

Section 152 Tenth merely makes criminal a willful violation of the other portions of Section 152.

**4.** Section 152 Third provides in full:

Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and

### B.

Since the instant action does not involve a dispute over the formation of a collective bargaining agreement or efforts to secure one, IAM understandably does not contend that its claims present a major dispute. (A. 100). According to IAM, however, neither does the matter at issue here involve a minor dispute. Instead IAM argues that its complaint is based on violations of rights provided by the Act, and as such, the controversy is not within the scope of the statutory scheme providing for resolution through arbitration.

In its complaint, IAM charged Northwest with violations of Section 2 of the Railway Labor Act provisions, 45 U.S.C. § 152 Third and Fourth.[3] Section 152 Third provides that parties to a collective bargaining agreement shall designate representatives without "interference, influence, or coercion by either party."[4] Section 152 Fourth provides that "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing" and makes it unlawful "for any carrier . . . to influence or coerce employees in any effort to induce them to join or remain or not to join or remain members of any labor organization."[5]

no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

45 U.S.C. § 152 Third.

**5.** Section 152 Fourth provides in relevant part:

Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees

Thus, by the enactment of Section 152 Third and Fourth, Congress sought to protect employees' rights by insuring that employees' designation of bargaining representatives would be free from employer coercion or interference. *See, e.g.* H.R.Rep. No.1944, 73d Cong.2d Sess. 2 (1934). To further that goal, the National Mediation Board was empowered to resolve representational disputes by investigation and certification of the representative that reflected the unfettered choice of the employees. 45 U.S.C. § 152 Ninth.

In giving effect to this statutory schema, courts have held that Section 152 Third and Fourth provide only limited rights outside the context of representational disputes, which Section 152 Ninth authorized the Mediation Board to resolve. For example, it has been held that these provisions provide employees with rights against wrongful discharge for participation in union organizing campaigns prior to a designation of a representative or to a certification by the Mediation Board. *See, e.g., Conrad v. Delta Air Lines, Inc.,* 494 F.2d 914 (7th Cir. 1974); *Burke v. Compania Mexicana De Aviacion, S. A.,* 433 F.2d 1031 (9th Cir. 1970).[6] These cases, however, involve situations completely distinguishable

from the controversies constituting "minor disputes" which are resolved by Boards of Adjustment. In these pre-certification cases, the employees could not grieve their discharges, because no bargaining representative had been designated or certified. As a result no collective bargaining agreement was in existence and no employees' dispute could be submitted to a Board of Adjustment because a Board had not been created.

### C.

IAM's complaint here, however, is not framed either in terms of a conventional dispute which would lead to arbitration under Section 153(i) or a representational dispute which would lead to investigation and certification by the National Mediation Board under Section 152. Indeed, IAM by its pleading negates such a representational dispute by conceding that it has been the representative of Northwest employees since 1946. Paragraph 5 of the complaint reads:

The Plaintiff has been the exclusive bargaining representative for the employees in the classifications covered by the contract since 1946. During that time Northwest Airlines, Inc. has recognized

---

in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . .
45 U.S.C. § 152 Fourth.

**6.** *See also Scott v. American Airlines, Inc.,* 488 F.Supp. 415 (E.D.N.Y.1980); *Adams v. Federal Express Corp.,* 470 F.Supp. 1356 (W.D.Tenn. 1979) *aff'd* 654 F.2d 452 (6th Cir. 1981); *Lum v. China Airlines Co. Ltd.,* 413 F.Supp. 613 (D.Haw.1976).

The district court, relying particularly on *Adams v. Federal Express Corp., supra,* reasoned that these cases, all of which involved pre-certification disputes, could be expanded to reach employer anti-union conduct after the employees had already designated a bargaining representative. As our discussion in text indicates, however, the language of Section 2 does no more than proscribe interference or coercion that takes place *prior* to employee designation of a bargaining representative. Thus, Section 2, by its express terms, has no relevance to post-designation conduct.

The district court analogized the instant situation to the circumstances presented in *Alexander v. Gardner-Denver,* 415 U.S. 36, 94 S.Ct.

1011, 39 L.Ed.2d 147 (1973). In that case, brought in a Title VII context, the Supreme Court held that the existence of a grievance procedure in the parties agreement did not bar the employee from pursuing his statutory remedy. The district court's reliance on *Gardner-Denver,* however, was misplaced. Where a collective bargaining agreement is in place, as it was here, Section 2 is limited in application to circumstances such as those presented in *Brotherhood of Railroad Trainmen v. Central of Georgia Rwy. Co.,* 305 F.2d 605 (5th Cir. 1962). As this case does not present such circumstances, Section 2 has no application and thus, the basis for the district court's rationale was flawed.

As is discussed in text, those cases which have presented post-designation claims of employer coercion and interference, *see Brady v. Trans World Airlines,* 401 F.2d 87, *cert. denied,* 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969) and *Brotherhood of Railroad Trainmen v. Central of Georgia Rwy. Co.,* 305 F.2d 605 (5th Cir. 1962), involve considerations vastly different than those presented here.

the Plaintiff as the exclusive representative of those employees and has entered into numerous contracts covered [sic] the hours, wages and terms of working conditions.

Thus, IAM's complaint against Northwest is hybrid in character. It resembles a grievance arbitrable under Section 153, in complaining of disciplinary actions against employees during the term of a collective bargaining agreement. But it asserts rights under Section 152 claiming employer misconduct designed to destroy IAM. It does so, even while acknowledging that the challenged conduct occurred during the term of an existing collective bargaining agreement.

To sustain the claim that *post*-certification misconduct would be cognizable in federal court, IAM relies upon a group of pre-certification cases to which we have previously referred. See note 6 *supra*. These authorities, because of their *pre*-certification posture, are obviously inapposite and cannot support IAM's jurisdictional claim. In addition, IAM refers to this court's decision in *Brady v. Trans World Airlines*, 401 F.2d 87, *cert. denied*, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969) and *Brotherhood of Railroad Trainmen v. Central of Georgia Rwy.*, 305 F.2d 605 (5th Cir. 1962). Its reliance upon these authorities is similarly misplaced.

In *Brady*, this court found that Section 152 provided rights (and therefore federal court jurisdiction) in a post-certification context when the existing Board of Adjustment was incapable of rendering a fair disposition of the grievances at issue. Brady had been discharged on the recommendation of the union after he allegedly refused to pay his union dues. After unsuccessful appeals to the System Board, Brady brought an action in district court charging the union with hostile discrimination in breach of its duty of fair representation. He charged TWA with wrongful discharge. This court rejected a challenge to jurisdic-

tion pointing out that the Act does not authorize adjustment boards to hear an employee's dispute against his own union. More to the point, however, this court recognized that reserving a dispute such as Brady's for a board made up of carrier and union representatives would be futile.

> [I]n such a dispute, which pits an employee against his union and his employer, the very parties whose power he challenged, would have the additional power of deciding whether they had exercised it in a proper manner.

*Id.* at 97.[7]

Thus, the jurisdictional holding in *Brady* has little relevance to the IAM's claims here, which involve "disputes between a carrier and its employees."

IAM also relies heavily on *Brotherhood of Railroad Trainmen of Central of Georgia Rwy. Co.*, 305 F.2d 605 (5th Cir. 1962). In *Trainmen*, Byington, the Chairman of the Brotherhood's General Grievance Committee, had been charged by the Railroad with gross disloyalty and threatened with disciplinary action for helping employees with their personal injury claims. Byington then brought a two count complaint against the Railroad. The first count, which the court characterized as the "Byington claim," charged that the Railroad's threatened actions deprived Byington of personal rights under the Collective Bargaining Agreement with the Railroad. Although this count was apparently intertwined with the second count, which presented Byington's "representational claim," the court held that regardless of the flagrancy of the Railroad's action, a violation of Byington's rights as an employee had to be resolved by the Board of Adjustment and could not be entertained by the district court.

The second count—the "representational count"—charged that the Railroad's scheduled disciplinary investigation against Byington was "'pursuant to a plan and scheme' of the Railroad and its officials for the purpose of discrediting the [Brother-

---

**7.** *See, also Brotherhood of Railroad Trainmen v. Smith*, 251 F.2d 282 (6th Cir. 1958) (suit against union for wrongful discharge as a re- sult of noncompliance with Union Shop Agreement).

hood and Byington] in the performance of their duties as craft representative ...." *Id.* at 606–07. It also charged that the "Railroad 'by its charges and the proposed investigation of Byington ... intends to ... hamper, impede and hinder the [Brotherhood and Byington] in their performance of their duties as craft representatives and General Chairmen, thus interfering, influencing, and coercing the trainmen employees in their free choice of craft representatives and their General Chairmen." *Id.* at 607.

The district court's dismissal of the second count was reversed. The Fifth Circuit held that the complaint stated a cause of action under Section 152 Third and Fourth, reasoning that a carrier "is not free to destroy the process of collective bargaining and resolution of grievances by wrongfully destroying the effectiveness of the chosen representative." *Id.* at 608. In so holding, however, the Court made it crystal clear that it considered nothing but the "bare bones" pleadings and therefore had to accept the allegations in the complaint as true. It stated:

> Whether the [charges] can be established by evidence is quite a different thing. But at this stage, on the pleadings only, and in advance even of evidence brought forward on a motion for summary judgment to establish that there is in fact no genuine controversy over the fact, the Trial Court could not determine the fact to be otherwise.

*Id.* at 608.

Other than *Trainmen,* our attention has not been directed to any authority that would provide for federal court jurisdiction in an action in which a union claims that the disciplinary measures taken by a carrier *during the existence of a collective bargaining agreement* were motivated by anti-union animus. We do not foreclose the possibility that given the appropriate case and the appropriate circumstances such an action could be brought in federal court. We note, however, that in this case, unlike the Railroad in *Trainmen,* Northwest has introduced verified factual assertions as to the

employees' discharges and suspensions, none of which have been controverted by IAM. Thus, we are not confronted with the "bare bones" pleadings which controlled *Trainmen's* disposition, but rather in this case the record contains sworn facts that have fleshed out the matters in controversy.

## III.

Turning to the circumstances of this case, we observe that IAM initially considered that the discharges and suspensions presented no more than a minor dispute and accordingly sought arbitration before the System Board. It was not until after its complaint was filed in federal court that IAM cancelled the arbitration proceedings.

As we previously have noted, IAM's complaint charged that Northwest had engaged in an effort to interfere in the Union's representation of its employee-members through a pattern of harassment and coercion. Northwest, however, responded with a factual recitation under oath supporting its claims that the controversy was no more than a minor dispute committed by the Act to the jurisdiction of the System Board. Thus, the district court had to answer a threshold jurisdictional question. Did IAM's complaint make out a claim under Section 152 cognizable in district court? Or, did IAM's complaint involve "disputes ... growing out of grievances or out of the interpretation or application of collective bargaining agreement," which Section 153 requires an adjustment board to resolve?

In support of its motion to dismiss for want of subject matter jurisdiction, Northwest filed a brief reciting the particular facts giving rise to the discharge and suspension of the six employees. It simultaneously filed an affidavit asserting under oath the truth of those factual assertions. No response in the form of affidavits or other sworn testimony was filed by IAM. Rather, as it subsequently developed, IAM relied upon its verified complaint, affidavits filed in support of its motion for a temporary restraining order and for a preliminary injunction. We attach no significance to the fact that the affidavits submitted by

IAM were submitted for purposes other than in response to Northwest's motion to dismiss. Rather in this discussion we will consider all the sworn materials. *Cf. Land v. Dollar*, 330 U.S. 731, 734, 67 S.Ct. 1009, 1010, 91 L.Ed. 1209 (1947) (affidavits submitted for other purposes not considered).

At the stage that the district court considered Northwest's motions, therefore, it had before it only IAM's conclusory assertions that Northwest had engaged in a campaign of coercion and interference.[8] On the other hand, Northwest had supported its motions with sworn statements that the employees had not been disciplined for their Union activities and that Northwest had not interfered with IAM's representation of Northwest's employees. These statements also revealed in detail the misconduct of the six employees that led to their discipline.

## A.

In a conventional summary judgment proceeding which involved the merits of a controversy, the district court's and our initial inquiry would be focussed on whether sworn assertions of the parties gave rise to a material or genuine dispute of fact. If a material dispute of fact arose, the case would proceed to a plenary trial. If it did not, the district court would decide the issue as a matter of law at the summary judgment stage. Here, however, the question with which the district court was confronted, and which was certified to us, is somewhat more complicated, because the question of the district court's jurisdiction was

entwined with the ultimate question on the merits.

If, under the appropriate standard, it is determined that Northwest had not disciplined the employees in order to destroy or undermine IAM's representation, then as a "minor dispute," subject matter jurisdiction in the district court would be lacking, *see Trainmen*, 305 F.2d at 607, and IAM's action should have been dismissed. If, however, the opposite were true, and Northwest's actions were found to constitute an effort by Northwest to destroy or undermine the IAM's representation of Northwest's employees, then the district court properly could assume jurisdiction over IAM's suit. Thus, in this situation it is apparent that the district court in determining its jurisdiction, must of necessity proceed to a decision which impacts on the merits. *See Land v. Dollar*, 330 U.S. 731, 739, 67 S.Ct. 1009, 1013, 91 L.Ed. 1209 (1947). As the Fifth Circuit, in discussing a similar situation in *Trainmen*, stated:

> The Court, therefore, would have jurisdiction of the charge adequately pleaded in the Representation Claim if the facts bear it out. It is thus a situation in which determination of the Court's jurisdiction will likely be simultaneous with the determination of the merits.

*Trainmen*, 305 F.2d at 609. In determining its jurisdiction, therefore, it is incumbent upon the district court to examine the entire record before it, on Northwest's motion to dismiss the action.[9]

**8.** IAM's complaint was verified by one Tim Connolly. Mr. Connolly identifies himself as a Grand Lodge Representative of the IAM. He explained, "The reason this verification is not made by the Plaintiff is that the Plaintiff is an unincorporated labor organization and I am currently an agent thereof." No separate verification by any of the disciplined employees appears in the record.

The complaint contains no specific details about the facts surrounding the disciplining of the employees. More importantly it does not state how Northwest interfered with or undermined representation of IAM employee members by "harassment, threats, and survalence [sic]." The only "fact" alleged is that shop

stewards and committeemen acting on behalf of IAM were disciplined, suspended and fired.

IAM introduced five affidavits in support of its motions for injunctive relief. These affidavits were no more factual than the complaint, and did not controvert Northwest's sworn contentions. Nor did they contain specific incidents, or facts, of harassment, interference, or coercion, that indicate that Northwest was engaged in an effort to destroy or undermine the IAM's representation of Northwest's employees. Moreover, they did not comment on, or refute, the circumstances which Northwest claims gave rise to the disciplinary action against the six employees.

**9.** The district court's opinion concludes by stating that, "[t]he complaint and supporting affi-

██ Northwest's motion was supported by a sworn statement of facts.• It therefore must be construed as a factual, rather than a facial attack on the court's subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). In such a case, the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *See, e.g., Land v. Dollar,* 330 U.S. 731, 735 n.4, 67 S.Ct. 1009, 1010 n.4, 91 L.Ed. 1209; *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 184–90, 56 S.Ct. 780, 782–85, 80 L.Ed. 1135 (1936). Until it has done so, and until it has determined that such power is vested in the court, any judgment rendered by the district court would be subject to attack on review, and indeed if jurisdiction was there found lacking, would be a nullity. It is for this reason that we said in *Mortensen v. First Federal Savings and Loan Association,* 549 F.2d 884 at 891 (1977):

> In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.[16]

16. *See* 5 C. Wright and A. Miller, Federal Practice and Procedure § 1350 ·(1969). The form of the inquiry is flexible though: "As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Gibbs v. Buck,* 307 U.S. 66, 71–72, 59 S.Ct. 725, 729, 83 L.Ed.'1111 (1939). That the district court is free to determine facts relevant to its jurisdiction has long been clear. *See, e.g., Wetmore v. Rymer,* 169 U.S. 115, 18 S.Ct. 293, 42 L.Ed. 682 (1898).

In circumstances such as the instant one, where the jurisdiction and the merits are intertwined, this court has instructed trial courts to demand less in the way of jurisdictional proof than would be appropriate at a full trial of the issue. See *Mortensen,* 549 F.2d at 892 (nexus with interstate commerce under Sherman Act; and, discussing decisions of other Circuits concerning procedures to be followed where the jurisdictional question requires factual inquiry into the merits in Sherman Act context).

### B.

██ Because a jurisdictional motion such as this one involves different considerations than are involved in conventional summary judgment procedures, we think it is appropriate to explain the analysis that a district court should undertake. In the first instance, to establish jurisdiction, the plaintiff proposing a Section 2 theory such as the one proposed here must allege that the defendant is engaged in a general campaign or effort designed to destroy or undermine the union's representation of its members. *See Trainmen, supra.* If no challenge to these allegations or facts is presented by the defendant, and the affirmative allegations satisfy the jurisdictional requisites, the action may be entertained in the judicial forum selected by the plaintiff.

██ If, however, the defendant contests the jurisdictional allegations, and does so, as it did here under oath, then it is incumbent upon the plaintiff to respond to the defendant's sworn factual assertions. In doing so, a conclusory response will not suffice any more in this jurisdictional context than it would if the ultimate merits were at issue in a conventional summary judgment context. *See, e.g., Exchange Nat. Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1131 (2d Cir. 1976); *Mortensen, supra.* The factual circumstances set forth by the plaintiff in such a case must meet and controvert the facts asserted by the defendant. If the plaintiff does not meet and controvert the defendant's factual assertions by affidavits or other sworn proofs, then the district court must determine

davits in this matter allege facts which clearly set forth a violation of the statute." Yet the preceding portions of its opinion are completely barren of any discussion of the sworn factual assertions of Northwest. We are therefore forced to the conclusion that the district court in reaching its decision had not considered the entire complex of affidavits and other sworn proofs before it. See *Land v. Dollar,* 330 U.S. 731, 735, 67 S.Ct. 1009, 1010, 91 L.Ed. 1209 (1947).

whether it has subject matter jurisdiction based upon the factual context presented by the defendant.

■ If, however, the plaintiff's and the defendant's affidavits present a disputed issue of material fact, the district court must permit the case to proceed to a plenary trial on the contested issues so that it may resolve the question of its jurisdiction even while hearing proofs that are equally pertinent to the merits. *See, Mortensen,* 549 F.2d at 892.

## C.

Applying these principles to the instant action, it is apparent that even with consideration of all the affidavits filed by IAM and IAM's verified complaint, IAM has not met Northwest's sworn detailed factual submissions. According to Northwest's affidavit, employee Martens was suspended for drawing obscene pictures; Petersel was discharged for physically threatening a supervisor; McDonnell was discharged for making obscene gestures at management officials in front of passengers; Williams was suspended for unauthorized absence from work and insubordination; and McCarthy was discharged for punching a supervisor.[10] Against these factual assertions, IAM has produced only conclusory allegations that Northwest interfered in the union's representation of its members through a pattern of harassment, intimidation, and coercion, including Northwest's actions in disciplining employees on contrived charges. No detailed statement of

10. See text *infra,* typescript p. 704 for a specification of the particular acts charged by Northwest.

11. See note 8 *infra.*

12. IAM also had charged that "duly authorized" IAM agents were unlawfully denied permission to represent the six IAM members at their disciplinary proceedings. Article XII of the IAM-Northwest Collective Bargaining Agreement, however, identified the individuals whom the IAM may authorize to represent employees at grievance proceedings. Northwest asserts that the IAM officials in question were Eastern Airlines employees and were not designated as authorized representatives under Article XII. Since the dispute on this matter involves the interpretation or application of the parties' Collective Bargaining Agreement, we hold that it is a minor dispute committed to resolution by the System Board.

facts supporting these conclusions appear in any of IAM's submissions, although IAM had ample opportunity to provide such materials. *See Local 336, American Fed. of Musicians v. Bonatz,* 475 F.2d 433, 437–38 (3d Cir. 1973).[11]

■ Under these circumstances the district court's task was clear. With no refutation by IAM of Northwest's sworn factual assertions, all that appears is that six employees violated various work rules promulgated by Northwest under the parties' Collective Bargaining Agreement, and that they were thereafter discharged or suspended. No sworn facts support IAM's conclusory charge that Northwest had mounted a general campaign to destroy or undermine IAM. In such a posture, the controversy which had been properly commenced as a System Board arbitration should have concluded in that forum, for under the Collective Bargaining Agreement and the Act, it constituted no more than a minor dispute committed to the System Board. *Trainmen, supra, Goclowski, supra.* Similarly, the other generalized charges found in IAM's complaint are also arbitrable before the System Board as minor disputes.[12]

## IV.

We hold that IAM's claims arising from the disciplinary action against the six employees who formerly held positions as shop stewards or committeemen are minor disputes subject to the exclusive jurisdiction of the IAM-Northwest System Board of Adjustment.

IAM also alleged that Northwest attempted to influence its employees to discontinue using the IAM as their bargaining representative. This allegation has no factual support in the record. It is undisputed that Northwest has continually recognized the IAM as the authorized bargaining representative for the class of employees in question and, prior to the institution of this action, Northwest agreed to submit the underlying disputes to the IAM-Northwest Board of Adjustment.

The district court's orders of October 2, 1980 and January 21, 1981 will be vacated and the case remanded to the district court with instructions to enter judgment dismissing IAM's complaint for want of subject matter jurisdiction.[13]

---

**13.** In light of our disposition, we do not address the other issues presented by Northwest in its appeal. Those issues include whether there is a private right of action in federal district court under the Railway Labor Act and whether the IAM's failure to exhaust its remedies before the adjustment board precluded it from bringing an action in federal court.