Denise A. GEORGE and Timothy
P. Kincaid, Plaintiffs

v.

NORTHWEST AIRLINES, INC. and International Association of Machinists and Aerospace Workers, Air Transport District 143, Local 1776, Defendants

No. 02–CV–6405.

United States District Court,
E.D. Pennsylvania.

Jan. 7, 2005.

Donald P. Russo, Donald P. Russo, Esquire, Lead Attorney, Susan Hutnik, Lead Attorney, Bethlehem, PA, for Plaintiffs.

Jennifer Rappaport, Paul Hastings Janofsky & Walker LLP, Lead Attorney, Jeffrey Andrew Bartos, Soye Kim, Guerrieri, Edmond & Clayman, Lead Attorney, Washington, DC, Richard B. Sigmond, Philadelphia, PA, for Defendants.

## MEMORANDUM OPINION AND ORDER

RUFE, District Judge.

Before the Court are separate Motions for Summary Judgment filed by Defendant Northwest Airlines, Inc. ("Northwest") and Defendant International Association of Machinists and Aerospace Workers, District 143, Local 1776 ("Union"). Plaintiffs have filed a single response to both Motions. For the reasons set forth below, the Court grants both Motions and enters judgment in favor of Defendants.

### I. *Factual Background*

Plaintiffs Denise A. George and Timothy P. Kincaid bring this hybrid action[1] against their former employer, Northwest,

---

1. A hybrid action contains claims against both the employer and the union, alleging that: 1) the employer breached an employee's rights under the collective bargaining agreement (CBA); and 2) that the union breached their duty of fair representation during the grievance process.

and their former labor organization, Union, pursuant to the Railway Labor Act, 45 U.S.C. § 151 *et seq.* Plaintiffs' Amended Complaint alleges that: 1) Northwest violated the CBA by terminating them without cause; 2) the Union violated its duty of fair representation during the grievance process, because it permitted delays in the process, failed to take the case to arbitration, and endorsed an unfair Last Chance Agreement (LCA) for Plaintiffs' reinstatement; and 3) Northwest pressured the Union to process Plaintiffs' grievances in a perfunctory manner, in an attempt to undermine the power of the Union.

At all relevant times, Plaintiffs were Northwest customer service agents at the Lehigh Valley International Airport, and were members of the Union. In late April 2001, Northwest managers learned that Plaintiffs might be improperly discounting tickets for friends and family members by using manual pricing to override standard fares and restrictions. During Northwest's ensuing investigation, Ms. George gave sworn testimony that she had discounted tickets and fraudulently issued travel vouchers to family and friends, and that she knew it was wrong. Mr. Kincaid gave sworn testimony admitting that he issued discounted tickets to family, friends, and an automobile racing team based in Virginia without case-by-case approval from his supervisor.[2] Michael Burke

("Burke"), who was Plaintiffs' supervisor at that time, testified that he was unaware of and did not authorize Plaintiffs' fare discount activity.[3]

Northwest conducted an audit of all customer service agents based at that airport in May, 2001. The audit report showed that eighteen of the twenty-two employees had engaged in manual price discounting fewer than ten times each over the period of the audit.[4] In contrast, Kincaid had done so 254 times, and George had done so 169 times over the same time period. Only two other employees had similarly elevated numbers, and Burke indicated that their discounts had been authorized for legitimate business purposes.

On May 22, 2001, Plaintiffs were terminated for discounting airfares for family, friends, and acquaintances without authorization, and for providing false or misleading information to Northwest during the investigation. Plaintiffs then filed grievances according to the terms of their collective bargaining agreement ("CBA"). The CBA contains a three step grievance process that concludes with arbitration by the System Board of Adjustment (the "Board"), chaired by a neutral arbitrator. Under the CBA, if the Board finds that employees were discharged without just cause, Northwest must reinstate them.

---

**2.** Mr. Kincaid also testified that he believed his supervisor had given him blanket approval to discount tickets at will, without case-by-case management approval, based on: 1) a remark his supervisor had made approximately eighteen months prior to April 2001; 2) the fact that his supervisor never told him he was doing anything wrong; and 3) the fact that he believed other employees were giving such discounts.

**3.** Plaintiffs dispute this testimony, arguing that discounting of fares was common practice among employees at their work site, and implicitly approved by Burke.

**4.** Northwest personnel could not remember if the audit covered 3 months, 6 months or 12 months. However, regardless of the time frame, it is clear that more than half of the employees used five or fewer waivers during the same time period in which Plaintiffs used over one hundred waivers. Northwest indicated that in some situations waivers are used for legitimate reasons, and the low number of waivers used by most of the Lehigh Valley employees is consistent with legitimate use.

In response to Plaintiffs' grievances, Northwest provided Plaintiffs with a Step One hearing on May 23, 2001, at which the Union's general chair, Ronald Cirrone ("Cirrone") represented Plaintiffs. Northwest denied Plaintiffs' grievances at Step One.

On May 30, 2001, the Union appealed the grievances to the next level. Step Two involves a meeting between the union representative and Northwest to see if any resolution can be reached. Under the CBA, neither the Union nor Northwest is required to invite grieving employees to participate in these meetings, and Plaintiffs were not invited to participate in this case. The Step Two meeting should have occurred within fifteen days of the request,[5] and a decision should have been issued within ten days of the meeting. Therefore, Plaintiffs should have received a written notice of the Step Two decision by June 25, 2001 at the latest. Instead, on August 6, 2001, Plaintiffs received a Last Chance Agreement ("LCA"), which Northwest had issued on July 17, 2001 and forwarded to Cirrone. The LCA provided for reinstatement subject to twenty-four months of probation. While Plaintiffs were on probation, Northwest could terminate them for any violation of company rules and policies. Plaintiffs could grieve the merits of any alleged violation but could not grieve the termination itself if they were found to have violated a rule or policy. The LCA also required Plaintiffs to admit wrongdoing and to agree that the time between termination and reinstatement would be considered a disciplinary suspension without pay. Plaintiffs rejected this settlement proposal, and asked Cirrone to proceed to arbitration. Cirrone advised Plaintiffs that he would file an arbitration request for them, but the decision to proceed with the grievances would be made by the Union's District 143 review committee, and not by Plaintiffs nor by Cirrone alone.[6]

On August 16, 2001, Cirrone notified Northwest that it had timely appealed Plaintiffs' grievances to the Board. Because the events of September 11, 2001 caused a backlog in the grievance system, Plaintiffs' grievances were not processed for many months. However, Cirrone met with Northwest's labor division in November, and finally, on January 16, 2002, Northwest offered both Plaintiffs another LCA, which was identical to the July 17, 2001 LCA. Around the same time, the Union reviewed the merits of the Plaintiffs' cases in light of the facts, the contract provisions, and prior arbitration decisions applicable to Plaintiffs' cases. The Union decided that it would not pursue arbitration of the grievances, and informed the Plaintiffs that it would withdraw their grievances from the Board docket if Plaintiffs did not sign the January 16, 2002 LCAs. When Plaintiffs declined to sign the January 16, 2002 LCAs, the Union withdrew their grievances. This litigation ensued.

## II. Northwest Airlines' Renewed 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

Northwest asserts that the Court lacks subject matter jurisdiction over Plaintiffs'

---

**5.** Cirrone testified that the meeting did take place by telephone within the CBA time frame.

**6.** Cirrone Aff. ¶ 22. As one of several District General Chairs, Cirrone was included as a member of the review committee. The committee also included the other District General Chairs, the District President and Directing General Chair. Collectively, the committee determines whether a grievance has sufficient merit to proceed with arbitration. *Id.*

claims against Northwest.[7] When a defendant makes a factual attack on subject matter jurisdiction,[8] no presumption of truth is accorded to the plaintiff's allegations, and the Court must weigh the evidence related to jurisdiction.[9]

■■■ Plaintiffs' claims are governed by the Railroad Labor Act ("RLA").[10] Under the RLA, "minor" contract disputes between an airline employee and the airline fall within the exclusive jurisdiction of the System Board of Adjustment, while federal courts have broad powers to intervene in some "major" disputes.[11] A "minor" dispute concerns the meaning or application of an existing, valid CBA provision to a specific situation.[12] A "major" dispute relates to the formation or alteration of a collective bargaining agreement.[13]

The Third Circuit has explained the analysis that the Court should employ to determine whether it has jurisdiction in a RLA case.[14] First, if Plaintiffs' complaint involves a "minor" dispute, Plaintiffs must allege that it falls into an exception to the statutory bar on jurisdiction.[15] Second, the Court must examine whether Northwest has challenged the allegations.[16] If Northwest challenges the allegations using sworn factual assertions, Plaintiffs must meet and controvert Northwest's factual allegations using their own affidavits or other sworn proofs.[17] If the affidavits of the parties present a disputed issue of material fact, the Court cannot determine jurisdiction without a plenary trial on the contested issues.[18]

■■■ This case falls squarely within the definition of a "minor" dispute, in that Plaintiffs argue that Northwest violated the CBA provisions on termination for cause in firing them; Plaintiffs do not allege any "major" dispute.[19] Although a minor dispute generally does not fall within the jurisdiction of this Court, there are four exceptions to the general rule: 1) when the employer repudiates the internal grievance machinery; 2) when resort to administrative remedies would be futile; 3)

---

7. · The Parties do not dispute the Court's jurisdiction over Plaintiffs' claims against the Union.

8. Northwest's Motion was supported by sworn statements of fact; therefore, the Court must construe it as a factual, rather than a facial, attack on jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Int'l Ass'n of Machinists & Aerospace Workers v. Northwest Airlines*, 673 F.2d 700, 711 (3d Cir.1982).

9. *Mortensen v. First Fed. Sav. & Loan Ass'n.*, 549 F.2d 884, 891 (3d Cir.1977).

10. 45 U.S.C. § 151 *et seq.*

11. *See* 45 U.S.C. § 184; *Capraro v. United Parcel Service, Co.*, 993 F.2d 328, 331 (3d Cir.1993); *Ass'n of Flight Attendants, AFL–CIO v. USAir, Inc.*, 960 F.2d 345, 347 (3d Cir.1992); *Int'l Ass'n of Machinists & Aerospace Workers*, 673 F.2d. at 705.

12. *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978).

13. *Id.*

14. *Int'l Ass'n of Machinists & Aerospace Workers*, 673 F.2d. at 711.

15. *Id.*

16. *Id.*

17. *Id.*

18. *Id.*

19. Plaintiffs argue that Northwest colluded with or pressured the Union to deprive Plaintiffs of their rights under the CBA in a deliberate attempt to weaken (i.e. alter) the CBA, making this dispute "major." Northwest disputes this argument, contending that Plaintiffs offer only speculation and unsupported allegations, not evidence, to support their position. The Court finds no genuine issue of material fact as to whether there was collusion or pressure to undermine the CBA, since this record is devoid of any such evidence.

when there is a breach of duty of fair representation claim against the Union, and the employer is somehow implicated in the Union's breach; and 4) where the Union, by breaching its duty of fair representation, effectively precludes the employee's opportunity to press his grievance against the employer.[20] Turning to the first prong of the jurisdictional test, the Court finds Plaintiffs' Complaint is *facially* sufficient to establish jurisdiction under exceptions one, three and four. The Complaint alleges that Northwest pressured the Union to refuse to process the employee's grievances. This allegation is relevant to exceptions one and three. The Complaint also alleges that the Union acted in bad faith, endorsing an unacceptably harsh LCA, and when Plaintiffs did not accept the LCA, refusing Plaintiffs' grievances to arbitration, precluding Plaintiffs' opportunities to press their grievances against Northwest. These allegations support a facial finding of subject matter jurisdiction under exception four, so the Court must turn to the second prong of the Third Circuit test for subject matter jurisdiction and determine whether there is a factual basis for jurisdiction.

Northwest and the Union have both challenged the facts underlying these allegations, as required by the second prong of the jurisdictional analysis.[21] Both Plaintiffs and Defendants have provided sworn testimony to the Court. The factual ques-

tions before the Court are: 1) whether Northwest repudiated the internal grievance machinery (exception one); and 2) whether the Union breached its duty of fair representation, and if so, a) whether the Union was implicated in this breach (exception three), or b) whether this breach precluded the Plaintiffs from effectively appealing their grievance (exception four). Plaintiffs have the burden of proof, and the Court need not view the evidence in a light favorable to either party.[22]

## A. Repudiation of the Internal Grievance Machinery

Northwest and the Union have offered evidence proving that Plaintiffs were terminated only after a complete investigation. Cirrone was present when Plaintiffs were questioned during the investigation. Thereafter, Northwest heard Plaintiffs' grievances at the first two steps of the three step grievance procedure set forth in the CBA. Within three days of termination, Northwest held a Step One hearing, in which Plaintiffs participated, represented by Cirrone. After Cirrone requested a Step Two meeting with Northwest, Northwest participated in the Step Two meeting by telephone and agreed to offer Plaintiffs a LCA to settle the grievance. Although Northwest notified Plaintiffs of the settlement which result-

**20.** *Childs v. Pa. Fed'n Bhd. of Maint. Way Employees,* 831 F.2d 429, 437–439 (3d Cir. 1987); *cf. Vaca v. Sipes,* 386 U.S. 171, 186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (approving analogous exceptions in the NLRA context).

**21.** The Union does not challenge the Court's subject matter jurisdiction as to the claims against it; however, the Union asks for summary judgment on the issue of its fair representation of Plaintiffs. This issue is relevant to jurisdiction. Therefore, sworn facts provided by both the Union and Northwest will

be considered in deciding the Court's jurisdiction over the claims against Northwest.

**22.** *Nesbit v. Gears Unlimited,* 347 F.3d 72, 77 (3d Cir.2003); *see also, Mortensen,* 549 F.2d at 890–891 (no presumptive truthfulness attaches to the plaintiff's allegations, the plaintiff has the burden of proof that jurisdiction does in fact exist, and existence of disputed facts will not preclude the court from evaluating for itself the merits of jurisdictional claims).

ed from the Step Two meeting several weeks late, this delay does not amount to a repudiation of the internal grievance machinery. Rather, Northwest's participation in the internal grievance process culminated in an offer to reinstate Plaintiffs.

As to Step Three, Northwest has no discretion over whether the Union presses a grievance forward to arbitration. Therefore, the failure to arbitrate does not demonstrate repudiation of the grievance mechanism by Northwest. There is no evidence suggesting that Northwest was in any way responsible for the Union's decision not to press forward with arbitration. Plaintiffs have set forth no evidence to prove that Northwest repudiated the internal grievance machinery, and the Court does not have jurisdiction over this case under exception one.

### B. *Breach of Duty of Fair Representation*

As a prerequisite to exceptions three and four, the Court must determine whether the Union breached its duty of fair representation to Plaintiffs. Federal law has imposed a fiduciary duty of fair representation on unions in the enforcement of collective bargaining agreements for their members.[23] Union representatives are required to "serve the interest of all members without hostility or discrimination toward any, to exercise (their) discretion with complete good faith and honesty, and to avoid arbitrary conduct."[24] To prove a breach of duty of fair representation, Plaintiffs must show that: 1) Northwest violated the CBA in terminat-

ing them; and 2) the Union's conduct was arbitrary, discriminatory, or in bad faith.[25] As the answer may be dispositive of jurisdiction, and does not involve disputed issues of fact, the Court will first examine whether the Union's conduct was arbitrary, discriminatory, or in bad faith.

■ The duty of fair representation does not confer on Plaintiffs an absolute right to force the Union to press their complaints to the end of the grievance process. The Union must act fairly under the CBA but may not assert or press grievances which it believes in good faith do not warrant such action.[26] The Union has "discretionary power to settle or even abandon a grievance, so long as it does not act arbitrarily."[27] This is true even if it can be demonstrated later that Plaintiffs' claims were meritorious.[28]

■ It is undisputed that the Union negotiated LCAs which allowed Plaintiffs to be reinstated in their former jobs on two occasions during the grievance process. According to Cirrone's uncontroverted testimony, the Union believed, based on the totality of the circumstances and past experience, that such LCAs were the only chance for Plaintiffs' reinstatement. The Union did not believe the Plaintiffs would be successful at arbitration. Therefore, when Plaintiffs refused to sign the second LCA offer, the Union withdrew their complaint to the Board. Nothing about this decision appears to be hostile, discriminatory, arbitrary, unreasonable, or in bad faith.[29] Plaintiffs do not allege any signifi-

---

**23.** *Bazarte v. United Transp. Union,* 429 F.2d 868, 871 (3d Cir.1970).

**24.** *Id.*

**25.** *Vaca,* 386 U.S. at 184–187, 87 S.Ct. 903.

**26.** *Id.*

**27.** *Id.*

**28.** *Id.*

**29.** *Vaca,* 386 U.S. at 177, 87 S.Ct. 903.

cant facts controverting Defendants' testimony on this point.[30]

Plaintiffs make much of the fact that the offered LCAs were "draconian" and would allow Northwest to terminate them for any violation of the rules and policies, regardless of how minor, during a two year probationary period. Plaintiffs feel that the Union should not have endorsed and encouraged them to sign the LCAs, which they perceived as profoundly unfair. Plaintiffs do not explain what is so "profoundly unfair" and "draconian" about requiring one's employees to follow company rules and policies. Furthermore, Plaintiffs admit that they would have been able to strictly comply with Northwest's rules during their probationary period. Moreover, they do not controvert testimony from the Union and Northwest that LCAs in this standard form are commonly used to resolve disciplinary concerns at Northwest.[31] Cirrone also testified that, in his experience, approximately 90% of employees on LCA probation successfully complete the probationary period. Plaintiffs were unaware of any contrary examples. Cirrone testified that he believed these were the "best and only terms" under which Plaintiffs would be reinstated as Northwest employees, and Plaintiffs do not controvert this testimony with any contrary evidence.[32] Nor do they rebut testimony that it is unusual for Northwest to offer a LCA after employees are terminated for ticketing rule violations, and that most ticketing cases in which LCAs are offered involved a "much lower" volume of improper ticketing than that attributed to Plaintiffs.[33] In rebuttal, Mr. Kincaid simply testified "I think the Union could have negotiated my job a little bit better than what they did [with the LCA]."

The Plaintiffs also complain about delays in the grievance process, but these delays do not demonstrate that the Union was perfunctory, arbitrary, discriminatory or motivated by bad faith in handling Plaintiffs' grievances. First, Plaintiffs complain

---

**30.** Plaintiffs' affidavits contain assertions regarding the bad faith motive of the union, but these assertions are entirely speculative, and Plaintiffs offer no factual evidence to support their speculations. For example, in her affidavit, Ms. George stated that the Union dropped the grievance because it was too expensive to go to arbitration, but provides no evidence of such a motivation. At deposition, she testified that she did not remember saying that, but she thought the Union felt she was an insignificant employee and could not be bothered to pursue her grievance. Neither opinion is supported by any facts. Mr. Kincaid testified in his deposition that the Union did as little as possible to cover itself, but provides no factual evidence that the Union was perfunctory in its handling of the case. He testified that he did not know what the Union considered, or how carefully it considered it, when it decided not to proceed with arbitration.

**31.** In his Declaration, Cirrone stated that, as general chair, he was responsible for the representation of Union members during compa-

ny investigations and the grievance process. During his five year tenure as general chair, he represented Union members in approximately 400 grievance actions. He estimated that he negotiated approximately fifty LCAs, all in essentially the same form as the one offered to Plaintiffs. A Northwest attorney, Susan Greisgraber testified that the LCA Northwest offered Plaintiffs is a standard, boilerplate language form agreement, developed in conjunction with the labor unions based on arbitration precedent.

**32.** Plaintiff Mr. Kincaid did testify that he believed he would "win" at arbitration, because he believed the arbitration panel would find his ticketing practices were endorsed by his manager. However, he cites no factual evidence to support his belief that he would "win," nor any evidence that a "win" would result in reinstatement under more favorable terms than those set forth in the LCA.

**33.** Similar testimony was provided by both Northwest attorney Susan Greisgraber and Cirrone.

that they were not given written notice of the alleged rule violation within fifteen days after their supervisor became aware of it, in violation of the CBA. However, Cirrone had approved two extensions of time for Northwest to investigate the alleged wrongdoing. Plaintiffs argued that Burke had given them permission to discount airfares and that such discounting was a common, accepted practice at their job site. Therefore, Cirrone believed a fully developed factual record, which would include both a "question and answer" session at which Plaintiffs would be able to testify as well as an investigation of ticketing records for all Allentown employees, was in Plaintiffs' best interest. Plaintiffs were on paid leave from Northwest throughout the investigation, so they were not injured by the extensions and in fact benefited by remaining on the payroll for several weeks after the company found it had grounds to terminate them. Second, it does appear that there was approximately a three week delay in issuing the step two appeal decision (in this case, the LCA). However, this delay was not the fault of the Union, as it was Northwest's responsibility to issue the LCA, and ultimately the delay resulted in a positive outcome for Plaintiffs the offer of reinstatement.

Plaintiffs assert that their cases had merit, and the Union's decision not to press the case forward to arbitration was made in bad faith. In a sworn statement, Ms. George asserted her belief that: "Union officials were motivated to go along with Northwest, despite the knowledge that the ultimate consequence would be to weaken the union, primarily because of the desire to avoid the immediate expense of defending these cases and to taking them to arbitration." [34] She provides no corroborating factual evidence that the Union's

decision not to take the case to arbitration was improperly motivated.

The Court finds that the Union's decision not to proceed to arbitration was reasonable under the circumstances, and was not improperly motivated, arbitrary, discriminatory, perfunctory, or made in bad faith. Having made this finding, the Court cannot find that the Union breached its duty of fair representation to Plaintiffs, even if Northwest did violate the CBA in terminating them.[35] Accordingly, the Court does not have subject matter jurisdiction over this case under exceptions three or four to the general rule concerning minor disputes under the RLA.

Having found that Northwest did not repudiate the grievance process and the Union did not breach its duty of fair representation, the Court finds that this matter does not constitute an exception to the general rule that the Board has exclusive jurisdiction over "minor" disputes. Therefore, the Court must dismiss Plaintiffs' claims against Northwest for lack of subject matter jurisdiction.

### III. The Union's Motion for Summary Judgment

The Union's Motion for Summary Judgment asserts that Plaintiffs have not put forth affirmative evidence supporting their claim that the Union breached its duty of fair representation to Plaintiffs. Plaintiffs believe there is a genuine issue of material fact as to that issue. As noted above, to prove breach of duty of fair representation Plaintiffs must show: 1) that the employer violated the collective bargaining agreement in terminating the employee, and 2) that the Union's conduct was arbitrary,

---

34. George Aff. ¶ 5.

35. As noted above, the Court does not reach this issue.

discriminatory, or in bad faith.[36] The Court will first consider the second issue, which it has also discussed in Section II, A, 2, *infra.*

The Union's Motion for Summary Judgment is governed by a different standard of review than Northwest's Motion to Dismiss for Lack of Subject Matter Jurisdiction. Under Federal Rule of Civil Procedure 56(c), the Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[37] To avoid summary judgment, the non-moving party must come forth with admissible factual evidence establishing a genuine issue of material fact.[38] In deciding a Motion for Summary Judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party,[39] but need not consider unsupported assertions, speculation or conclusory allegations.[40] The Court must determine whether there are any genuine issues for trial.[41]

Even viewing the evidence in a light most favorable to Plaintiffs, the Court does not find any evidence establishing a genuine issue of material fact as to whether the Union breached its duty of fair representation. Although there were delays in the process[42] and the Plaintiffs were clearly unhappy with the outcome, Plaintiffs have set forth no evidence that the Union's conduct towards them was arbitrary, discriminatory, perfunctory or in bad faith.[43] All the evidence suggests that the Union acted reasonably, within its discretion, and with proper motive throughout the grievance process. Plaintiffs have presented no contrary evidence. Furthermore, the Union was able to achieve favorable outcomes for Plaintiffs, twice procuring agreements from Northwest to reinstate Plaintiffs after Northwest decided to terminate them.[44] There is no evidence to support a contention that the Union had a bad motive for endorsing the LCAs, that the endorsement of the LCAs was discriminatory, or that the Union's representation in procuring the LCAs was perfunctory.

Plaintiffs have not raised any genuine issues of material fact regarding the second element of its breach of duty of fair representation claim, and therefore, without examining the first element of the claim, the Court will grant the Union's Motion for Summary Judgment.

An appropriate Order follows.

36. *Vaca,* 386 U.S. at 184–187, 87 S.Ct. 903.

37. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

38. *Id.*

39. *EEOC v. Westinghouse Elec. Corp.,* 725 F.2d 211, 216 (3rd Cir.1983).

40. *Easton v. Bristol–Myers Squibb, Co.,* 289 F.Supp.2d 604, 609 (E.D.Pa.2003)

41. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

42. Although there were some delays, there is no evidence that the Union ignored Plaintiffs' grievances, and the Union filed all appeals in a timely manner.

43. Having decided the second issue conclusively, the Court need not reach the question of whether the employer actually violated the CBA, about which there are arguably disputed issues of material fact.

44. *McGovern v. Int'l Bhd. of Teamsters,* 447 F.Supp. 368, 371 (E.D.Pa.1978) (when a union negotiates a discharged employee's reinstatement, the union has not acted arbitrarily, discriminatorily, or in bad faith).

## ORDER

**AND NOW**, this 7th day of January, 2005, upon consideration of Northwest Airlines, Inc.'s Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction and Motion for Summary Judgment [Doc. # 55], Plaintiff's responses thereto [Doc. # 57, 64], and Northwest's reply and supplemental information [Doc. # 59, 63], and upon consideration of the International Association of Machinists and Aerospace Workers' Motion for Summary Judgment [Doc. # 56], Plaintiff's response thereto [Doc. # 57], and the Union's reply [Doc. # 60], and for the reasons set forth in the attached memorandum opinion, it is hereby **ORDERED**:

A. Northwest Airlines, Inc.'s Motion is GRANTED;

B. The Union's Motion is GRANTED;

C. Plaintiffs' claims are hereby DISMISSED with prejudice.

D. The Clerk of the Court shall mark this case CLOSED for statistical purposes.

It is so **ORDERED**.