INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WARE-
HOUSEMEN AND HELPERS OF
AMERICA, Plaintiff,

v.

PAN AMERICAN WORLD AIRWAYS,
INC., Defendant.

No. 85 CV 1239.

United States District Court,
E.D. New York.

April 24, 1985.

Herbert K. Lippman, New York City, Roland P. Wilder, Jr., and Wilma B. Liebman, Washington, D.C., for plaintiff.

Ernest L. Garb and Richard Schoolman, Pan American World Airways, Inc., New York City, Morgan, Lewis & Bockius, Washington, D.C. by Bradford W. Coupe, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This is an action under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* Plaintiff union seeks a preliminary injunction ordering Pan American World Airways, Inc. ("Pan Am") to observe certain recall, furlough and seniority rules and practices in the course of recalling employees who previously were on strike.

### Findings of Fact

The International Brotherhood of Teamsters ("IBT") represents some 6,200 clerical and related employees, supply clerks and nurses employed by Pan Am, of which some 5,800 were actively employed on February 27, 1985. Pan Am and the IBT have entered into successive collective bargaining agreements since 1969. The most recent collective bargaining agreement was, by its terms, in effect from January 1, 1978 through December 31, 1981. That agreement, as amended, has been extended by the parties, most recently by a supplemental agreement expiring on December 31, 1984.

In the fall of 1984, the parties exchanged notices pursuant to Section 6 of the RLA, indicating their desire to renegotiate certain terms of the Agreement. The parties have not yet exhausted the mandatory procedures of the RLA regarding their respective proposals. Consequently, the terms of the basic agreement remain in effect pursuant to the section 6 "status quo" requirement.

Although Pan Am and the IBT have not exhausted the statutory procedures regarding their contract dispute, Pan Am did exhaust those procedures in its dispute with the Transport Worker's Union ("TWU"). Accordingly, on February 28, 1985, the TWU-represented employees went on strike. The TWU picket lines were honored by the IBT-represented employees.

To avoid potential claims for pay by those IBT members who might not support the sympathy strike and who would be willing to work, Pan Am immediately invoked Article 14 of the agreement. Pursuant to the terms of Article 14, Pan Am informed all IBT members that because of the strike no work existed and they were not to report to work until further notice.

The Airline Pilots Association, International ("ALPA") and the Flight Engineers' International Association ("FEIA"), whose members initially honored the TWU picket lines, subsequently entered temporary "back to work" agreements with Pan Am. These agreements provided that the employees would return to work, on a limited operations schedule, with no reprisals or recriminations by Pan Am. The IBT, however, continued to honor the TWU strike.

Around March 10, 1985, Pan Am began to increase flight service. Accordingly, some IBT members were notified to return to work. Most of the notified employees, however, refused to return to work, and continued to honor the TWU picket lines.

Pan Am then sent mailgrams to IBT members whose jobs had *not* been re-activated, notifying them that work was available, and requesting that they express their desire to fill certain open positions for the duration of the strike.

On March 23, 1985, a tentative agreement was reached by Pan Am and the TWU, thus, settling their dispute. Accordingly, Pan Am began taking steps to expand its operations. Because Pan Am realized that its return to normal operations would take time, it negotiated a gradual return-to-work agreement with the TWU. Pan Am also attempted, without success, to

negotiate a return-to-work agreement with the IBT that would provide for the orderly return of Teamster employees as work became available. The union's position, essentially, was that Pan Am's proposed agreement constituted an abrogation of seniority rights since it would permit Pan Am to leapfrog senior employees for extended periods while calling back junior employees.

On March 27, 1985, the TWU employees ratified their contract. Subsequently, the IBT members who had been on strike attempted to return to work *en masse*. At that point, Pan Am was operating at approximately 50% of its capacity. Pan Am gave assignments to those workers for whom work was available, but again invoked Article 14 as to the remainder of the IBT-represented employees for whom there was no work. Pan Am has to date recalled approximately 3,900 IBT members.

The union now sues to enjoin Pan Am to follow the seniority, furlough and recall procedures contained in the Agreement. The Agreement establishes seniority classifications on both the district and system-wide levels. The Agreement details the procedures the Company must follow if there is a reduction in force. Essentially, the Agreement allows senior employees who are to be laid-off to exercise displacement rights as to positions held by more junior employees. This so-called "bid and bump" procedure applies at both the district and system wide levels.

Finally, the Agreement establishes a procedure for the recall of employees to active service when forces are increased. This procedure also accounts for seniority preferences by allowing senior employees to "bid" for posted positions.

### Discussion

The union contends that Pan Am's recall of employees without regard to the above-mentioned procedures (a) constitutes a uni-lateral attempt to change the agreement, i.e., is a *major* dispute, giving rise to a § 6 status quo violation, and (b) is a discriminatory and unlawful attempt to coerce employees in the exercise of their rights and to undermine the union's representative status, in violation of § 152, Third and Fourth of the RLA. The Company contends, not surprisingly, that the dispute between the parties is minor, and that its actions were in no way motivated by anti-union animus.

MAJOR/MINOR DISPUTE

The distinction between major and minor disputes under the RLA has been summarized by the Second Circuit as follows:

> "Major disputes" are those involving the formation of collective bargaining agreements or changes in the terms of existing agreements. They relate to "the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." "Minor disputes" involve the application of particular provisions of an agreement that are not the subject of a proposal for change. They relate to rights already accrued rather than to proposals for future rights. The procedures for resolving major disputes involve a long, drawn out process involving negotiation and mediation by the National Mediation Board during which parties to the dispute are obligated to maintain the status quo. "Minor disputes" in the airline industry, by contrast, are resolved by mandatory grievance arbitration procedures before the System Board of Adjustment.

*Air Cargo, Inc. v. Local Union 851, International Brotherhood of Teamsters,* 733 F.2d 241, 245 (2d Cir.1984) (citations omitted).

■ Thus, in essence, major disputes involve questions of contract formation, whereas minor disputes involve questions of contract interpretation.[1]

---

1. The fact that the parties have served § 6 notices is not dispositive. As the Second Circuit has pointed out: "If one party has served a section 6 notice indicating a desire to change a collective bargaining agreement, it is still for the district court to determine whether the dispute in question is actually over a proposed change in rates of pay, rules or working conditions, and

■ The Second Circuit has indicated that to resolve the major/minor dispute controversy the court should look first "to the collective bargaining agreement to determine whether a plausible interpretation would justify the carrier's action. A dispute is major if the carrier's contractual justification for its actions is 'obviously insubstantial.' On the other hand, a dispute is minor if the contract is 'reasonably susceptible' to the carrier's interpretation." *Air Line Pilots Association v. TWA*, 713 F.2d 940, 948 (2d Cir.1983), *rev'd in part on other grounds*, — U.S. —, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), *quoting Local 553, Transport Workers Union v. Eastern Air Lines, Inc.*, 695 F.2d 668, 673 (2d Cir. 1982).

Pan Am argues that Article 14 of its Agreement with the IBT provides a plausible contractual justification for its action. Article 14(a) states that "any employee called to work or permitted to come to work when there is temporarily no work because of ... work stoppages and strikes, shall receive a minimum of six (6) hours' pay ... unless notified that there will be no work...." The union argues that Article 14(a) is irrelevant and that the seniority recall procedures of Articles 7 and 23 apply.

Article 23 provides, in pertinent part, that "when forces are increased or a vacancy occurs, the positions must be filled in accordance with Article 7." Article 7 provides that a vacancy is to be offered, first, to the senior qualified employees in the immediate work unit; then, to senior qualified employees in related units; and, finally, to those senior qualified employees in the seniority district who have been laid-off.

The relationship among these three articles of the same contract does not emerge with dramatic clarity. Certainly, Article 14 authorized Pan Am to take the IBT-employees off the payroll temporarily, without the formal lay-off procedures which require prior notice and the invocation of seniority displacement rights.[2] Significantly, however, Article 14 is silent as to the procedures to be employed in calling employees back to work.

The union urges that the seniority recall procedures of Articles 7 and 23 should be applied. Pan Am contends, however, that the seniority recall procedures, which concededly apply in the normal layoff and recall settings, do not apply in the special circumstances of a start-up following a strike.

Essentially, Pan Am's position is that Articles 7 and 23 are triggered only when the lay-offs were caused by economic factors as distinct from closing down the operation because of a strike. Pan Am emphasizes that IBT-employees were never formally removed from the positions they held before the strike, nor were these positions abolished. Thus, Pan Am contends that it is not obligated to recall the IBT-employees under the procedures applicable in normal lay-off situations. Rather, in Pan Am's view, Article 14 permits an orderly return, as work becomes available, to pre-strike positions by workers who held those positions when the strike commenced.

Pan Am bolsters its contractual argument by noting that, since both Article 14 and Article 23 are silent as to the procedures to be used in recalling employees in a post-strike setting, the company is entitled to rely upon the management clause contained in Article 39. Article 39 states that:

---

is therefore major." *Air Cargo,* 733 F.2d at 247 n. 6. It is true that Pan Am's section 6 notice contained a proposal to alter seniority classifications. Nonetheless, the instant dispute involves the validity of the company's actions taken to restore operations following a sympathy strike that did not exist and could not be anticipated at the time the § 6 notices were served. Accordingly, the service of § 6 notices is of little relevance to this case.

**2.** Indeed, to this extent, Pan Am's position is supported by a previous adjustment board decision construing language identical to Article 14. *See Pan American World Airways, Inc. v. International Brotherhood of Teamsters,* System Board of Adjustment Opinion dated June 29, 1961. That decision, however, did not address the question of *recalling* workers *after* a strike.

The management of the Company and the direction of its employees, including ... the laying off and calling to work of employees in connection with any reduction or increase in working forces, are the exclusive functions of management to the extent that any of such matters are not otherwise covered or provided in this Agreement; and provided that, in the exercise of such functions, the management shall not violate any provisions of the Agreement.

Pan Am concedes that its creative interpretation of Article 14 applies only during the post-strike build-up period when work is temporarily unavailable. Thus, if a position becomes permanently unavailable, as would happen if a final decision were made to eliminate positions performed before the strike, Pan Am agrees that the seniority-displacement procedures and reduction in force obligations of the Agreement would clearly apply.

■ However improbable Pan Am's contractual justification may be, it is nonetheless "plausible." In short, I face a classic case of contract interpretation involving the question whether the silence in Article 14 regarding recall of employees implies that the seniority-displacement procedures are to be implemented in effecting a recall, or whether silence supports Pan Am's position that as work becomes available, employees are to be returned to the positions they held prior to the strike. As such, this question lies within the exclusive jurisdiction of the Adjustment Board. *Local 553, Transport Workers Union v. Eastern Air Lines, Inc.*, 695 F.2d 668, 675 (2d Cir.1982).

■ To blunt Pan Am's contractual argument the union asserts that the sheer number of employees affected in this case renders this a "major" dispute. The Second Circuit has noted that "in close cases, ... [the Court may look to] the pragmatic effects of the carrier's action on working conditions to see whether the magnitude of the disruption caused by the carrier is "major" in a literal sense." *Airline Pilots*, 713 F.2d at 948.

While the number of employees affected by Pan Am's actions would make the ulti-mate resolution of grievances an arduous and, perhaps, prolonged task, it should be remembered that such grievances are nonetheless capable of being resolved through the normal procedures. Moreover, it is significant that the injunctive relief sought would not, and could not, provide for the immediate recall of *all* IBT-employees. Given the economic plight of the airline industry, it is clear that Pan Am's post-strike operations, and thus, the work availability for employees, must be restored gradually. An injunction from this Court would affect the identity, not the number, of employees returned to work.

Finally, the Court is mindful of Pan Am's representation, discussed in the next section, that the company will shortly make a final decision regarding those positions to be eliminated, and thus, will be in a position to implement the seniority-displacement procedures prescribed by the Agreement. While bearing primarily on the issue of irreparable harm, this factor would likewise appear to be relevant in assessing the magnitude of the dispute.

Accordingly, I find that this is a minor dispute lying within the exclusive jurisdiction of the adjustment board.

*Availability of Injunctive Relief*

■ Having determined that the parties' dispute is "minor," this Court is empowered to issue injunctive relief only in those narrow instances where such relief is necessary to prevent "injury so irreparable that a decision of the Board in the unions' favor would be but an empty victory." *Local 553*, 695 F.2d at 675 (quoting *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co.*, 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960)). In the instant case, an adjustment board decision for the union could be effectuated by the normal grievance and dispute resolution procedures, with the senior employees who have not been returned to work being compensated in money damages. While the availability of monetary relief at a later date must surely be of little comfort to those out of work employees faced with immediate financial hardship, the law is clear in this Circuit that lost

wages do not constitute irreparable harm where the financial injury falls on an easily ascertainable group of employees capable of ultimately being redressed. *Local 553,* 695 F.2d at 678.

Moreover, any concern that the length of time necessary for the Adjustment Board to reach a decision may, indeed, lead to irreparable harm is alleviated by Pan Am's representation that shortly after April 26, 1985, it will be in a position to determine a final work roster, and to begin instituting normal seniority-displacement procedures.

Accordingly, because injunctive relief is not necessary to preserve the jurisdiction of the Adjustment Board, the union's motion is denied.

*The Coercion/Discrimination Claims*

The union has also based its request for injunctive relief on the ground that Pan Am has violated Sections 152, Third and Fourth of the RLA[3] by (a) retaining in active employment employees who had crossed the TWU picket lines, instead of recalling employees with greater seniority who honored the TWU strike, and (b) failing to institute or delaying the institution of established seniority, furlough and recall procedures for the purpose of punishing employees who engaged in activity protected by the Act or for the purpose of disparaging the employees' representative. The union points to certain hostile comments allegedly made by Pan Am officials, as well as to alleged incidents of harassment of employees and their representatives.

It is clear, however, that the primary acts complained of, *i.e.,* the retention or recall of certain employees to the exclu-

sion of other, more senior, employees, lie at the very heart of the contractual interpretation dispute to be referred to the Adjustment Board.[4] It is therefore, doubtful that this Court has the jurisdiction to issue the relief requested. *See International Association of Machinists v. Northwest Airlines, Inc.,* 673 F.2d 700, 712 (3d Cir.1982); *Local Union 808, International Brotherhood of Teamsters v. P & W Railroad Company,* 576 F.Supp. 693, 703 (D.Conn. 1983). In any event, while Pan Am's attitude might be characterized as callous, and perhaps shortsighted, a benighted conception of labor relations does not rise to the level of discrimination or coercion that would justify judicial intervention.[5] *See Local Union 808,* 576 F.Supp. at 703.

Accordingly, the union's request for injunctive relief is denied.

SO ORDERED.

---

**3.** Section 152, Third, of the RLA provides that "no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives who or which are not employees of the carrier." Section 152, Fourth states, in pertinent part, that "it shall be unlawful for any carrier to interfere in any way in the organization of its employees ... or to influence or coerce employees in an effect to induce them to join or remain or not to join or remain members of any labor organization."

**4.** Moreover, the union's claim of obstruction of union representatives is grounded in Article 41

of the Agreement, which defines the rights of those representatives, and thus, again, presents a minor dispute appropriate for the Adjustment Board.

**5.** It is not without significance that the "anti-union animus" doctrine has limited application outside the context of representational disputes. *See International Association of Machinists,* 673 F.2d at 707. Moreover, as previously discussed, the union has not established the level of irreparable harm that would support a grant of injunctive relief. *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 758 (2d Cir. 1979).