847 F.2d 403
 128 L.R.R.M. (BNA) 2425, 56 USLW 2708,
109 Lab.Cas. P 10,541
 BROTHERHOOD OF RAILWAY, AIRLINE & STEAMSHIP CLERKS, FREIGHT
HANDLERS, EXPRESS & STATION EMPLOYEES, an
association, and BRAC Santa Fe Systems
Board of Adjustment,
Plaintiffs-Appellants,
v.
The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Defendant-Appellee.
 No. 87-1313.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 5, 1987.
Decided May 20, 1988.
 
 John A. Edmond, Guerrieri & Sweeney, P.C., Washington, D.C., for plaintiffs-appellants.
 John J. Fleps, Santa Fe Southern Pacific Corp., Legal Dept., Chicago, Ill., for defendant-appellee.
 Before COFFEY and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 COFFEY, Circuit Judge.
 
 
 1
 This appeal requires the court to determine the breadth of federal courts' jurisdiction over a dispute between a railroad, the Atchison, Topeka & Santa Fe Railway Company ("Santa Fe"), and a union, the Brotherhood of Railway, Airline & Steamship Clerks, Freight Handlers, Express & Station Employees ("BRAC"). BRAC sued Santa Fe in federal district court, asking that the court enjoin a Santa Fe program or plan to purchase the resignations of certain BRAC-represented clerical employees. The parties refer to the compensated resignations as "buyouts." BRAC alleges that the buyout program constitutes impermissible direct dealing with union members as well as an unauthorized unilateral change in working conditions, in violation of section 152, paragraphs Third and Fourth and section 152, paragraphs Second and Seventh, respectively, of the Railway Labor Act ("the RLA"). See 45 U.S.C. Sec. 152, paragraphs Second, Third, Fourth, Seventh (1982). The district court dismissed BRAC's suit for lack of subject matter jurisdiction, finding that the dispute was minor and thus within the exclusive jurisdiction of the National Railroad Adjustment Board ("the NRAB"). BRAC appeals.
 
 FACTS
 
 2
 BRAC is the certified representative of the clerical workers of Santa Fe. Santa Fe is an interstate carrier by rail within the meaning of the RLA and their labor relations are governed by the RLA. Over the years, Santa Fe and BRAC have entered into several collective bargaining agreements. The agreement now at issue, effective June 1, 1981, includes a "Mediation Agreement." Among other things, the Mediation Agreement provides that any BRAC-represented "protected" employee who is involuntarily furloughed (laid off) will continue to receive "protective payments" from Santa Fe. Protected status is achieved through seniority and is specifically defined in the Mediation Agreement. The Mediation Agreement also recites that Santa Fe may reduce the number of protected employees if its business declines, but must restore the benefits of those workers if business subsequently improves. Both the reduction and the restoration of protective benefits is carried out by Santa Fe pursuant to a seniority-based formula provided by the Mediation Agreement. The Mediation Agreement is silent with regard to voluntary resignations.
 
 
 3
 In 1981, Santa Fe's business declined substantially and, pursuant to the Mediation Agreement, Santa Fe reduced the number of protected employees. By mid-1983, however, Santa Fe's business rebounded and Santa Fe faced increased protective payments under the Mediation Agreement. Santa Fe officials immediately became concerned with the cost of those payments. On August 19, 1983, B.J. East, Santa Fe's Assistant to the Vice President--Labor Relations, concluded that "the company may want to give consideration to some type or form of payoff to employees in return for their resignations in order to avoid these continuing monthly protective payments."
 
 
 4
 During 1984, Santa Fe and BRAC attempted to negotiate a buyout program designed to reduce the carrier's protective payments, but failed to reach agreement. In January 1985, Santa Fe unilaterally began to offer various individual clerks a cash payment of $3,500.00 in exchange for their resignations and waivers of all BRAC-negotiated rights. In February 1986, Santa Fe offered clerks whose seniority allowed them regular job assignments $10,000 for their resignations. In April 1986, Santa Fe offered clerks at certain locations varying amounts to resign, depending upon their status and seniority: currently assigned clerks were offered $20,000, furloughed clerks with at least six years of service were offered $10,000, and furloughed workers with less than six years of service were offered $4,000.00.
 
 
 5
 BRAC contends that it did not acquiesce in any of the buyout offers, but protested them vigorously whenever information concerning the offers came to its attention. For example, BRAC argues that it informally protested the buyouts, both orally and in writing, from the time it learned of the first Santa Fe program in 1985. BRAC also filed grievances protesting the buyout program in March 1985, but it did not pursue the grievances further. In January and March 1986, BRAC protested the Santa Fe programs by mailgram and letter. Finally, on May 2, 1986, BRAC filed this suit.
 
 
 6
 Santa Fe, on the other hand, alleges that BRAC knew of and impliedly agreed to its buyout programs. In support of its claim, Santa Fe contends that a BRAC official signed as witness on resignation forms executed by several clerks pursuant to Santa Fe's first offer and that two other BRAC officials accepted Santa Fe buyout offers and resigned in 1986. Furthermore, Santa Fe cites several instances in which it has solicited clerks to resign in exchange for cash payments under a variety of circumstances without protest by BRAC. For example, for many years Santa Fe had solicited resignations of employees represented by BRAC and other unions in settling personal injury and employment discrimination claims. Also, in December 1983 and January 1984, the railroad used a plan similar to the one before us to encourage attrition after a merger. Santa Fe claims that BRAC knew of these programs, but did not challenge them and explicitly acquiesced in the post-merger buyout program. Similarly, Santa Fe contends that it purchased the resignation of a BRAC-represented clerk in June 1984 with BRAC's full knowledge and acquiescence. Accordingly, the railroad contends that the parties had developed an established practice allowing Santa Fe to buy voluntary resignations, a practice well enough defined by the parties' course of dealing to become a part of their collective bargaining agreement.
 
 
 7
 The district judge examined the evidence and determined that Santa Fe's contention that buyouts were an established past practice was neither frivolous nor obviously insubstantial. As a result, the court characterized the dispute before it as minor--one involving the interpretation of an existing collective bargaining agreement. Thus, the dispute fell within the exclusive jurisdiction of the NRAB and the district judge declined to reach the merits. The court did not discuss whether it could exercise jurisdiction based on BRAC's allegation of statutory violations. Bhd. of Ry., Airline & Steamship Clerks v. Atchison, T. & S.F. Ry., No. 86 C 3793, slip op. (Feb. 12, 1987)
 
 DISCUSSION
 
 8
 Federal courts determine whether they may exercise jurisdiction over labor disputes involving interstate rail and air carriers by analyzing the nature of the dispute at hand. Two separate grounds may allow federal jurisdiction. First, federal courts may entertain suits involving major disputes. Major disputes are those that involve formation, rather than interpretation, of collective bargaining agreements. Ry. Labor Executives Ass'n v. Norfolk & W. Ry., 833 F.2d 700, 704 (7th Cir.1987). Second, federal courts may exercise jurisdiction over some disputes which involve violations of specific provisions of the RLA. See Ry. Labor Executives' Assoc. v. Boston & Maine Corp., 808 F.2d 150 (1st Cir.1986). But cf. Int'l Ass'n of Machinists v. Alaska Airlines, 813 F.2d 1038, 1040 (9th Cir.1987) (jurisdiction over RLA violations limited to "exceptional circumstances"). On appeal, BRAC initially argues that this is a major dispute and next contends that its allegation of RLA violations confers jurisdiction on the federal courts without regard to whether the dispute may be characterized as major or minor. We disagree and affirm the decision of the district court.[1]
 
 
 9
 * Jurisdiction Over Major and Minor Disputes
 
 
 10
 The RLA does not refer to "major" or "minor" disputes. The Supreme Court supplied those labels to distinguish the disputes governed by section 2 of the RLA from those decided under section 3. Norfolk & W. Ry., 833 F.2d at 704.
 
 
 11
 The first [major disputes] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.
 
 
 12
 The second class [minor disputes], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.
 
 
 13
 Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945), aff'd upon reh'g, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). In essence, a major dispute involves the creation of a contract or a change in the terms of an existing contract, while a minor dispute involves the interpretation or application of an existing contract. Chicago & N.W. Transp. v. Int'l Bhd. of Elec. Workers, Local Union No. 214, 829 F.2d 1424, 1427 (7th Cir.1987).
 
 
 14
 In determining whether a dispute can be resolved by reference to an existing agreement (and thus labeled minor), we do not restrict our analysis to the explicit terms of the written documents. Instead, we interpret the collective bargaining agreement to include those established past practices that form the course of dealing between the parties. Detroit & T.S.S. Line R.R. v. United Transp. Union, 396 U.S. 142, 153-54, 90 S.Ct. 294, 301-02, 24 L.Ed.2d 325 (1969). Moreover, the party seeking to establish that a dispute is minor does not face a heavy burden. When the parties disagree on whether a dispute can be resolved under an existing agreement, "the dispute is minor unless the carrier's claims of contractual justification are 'frivolous' or 'obviously insubstantial.' " Atchison, T. & S.F. Ry. v. United Transp. Union, 734 F.2d 317, 321 (7th Cir.1984); Norfolk & W. Ry., 833 F.2d at 704 (quoting Atchison, T. & S.F. Ry. v. United Transp. Union ); see also Chicago & Nw. Transp. v. United Transp. Union, 656 F.2d 274, 279 (7th Cir.1981). Finally, because a major dispute may escalate into a strike, we resolve all doubts in favor of finding the dispute at issue to be minor. Norfolk & W. Ry., 833 F.2d at 705; Bhd. of Locomotive Eng'rs v. Atchison, T. & S.F. Ry., 768 F.2d 914, 920 (7th Cir.1985).
 
 
 15
 Applying these standards to the case at hand, we agree with the district court's holding that this dispute is minor. The collective bargaining agreement between BRAC and Santa Fe does not address voluntary resignations; therefore, any agreement between the parties on the subject of voluntary resignations must be found outside the written documents. Thus, the court appropriately considered evidence of a course of dealing. See Norfolk & W. Ry., 833 F.2d at 705.[2] Reviewing that evidence, initially the court found that the Santa Fe buyouts in settlement of personal injury and employment discrimination claims bore only limited relevance to the issue at hand. However, the remainder of Santa Fe's past-practice evidence was sufficient to support a nonfrivolous claim that buyouts of clerical employees had become an established part of the parties' understanding of their contract. The court specifically noted that BRAC did not protest the post-merger buyout program or the buyout of an individual clerk in 1984, and that a BRAC official served as a witness on resignation forms tendered by BRAC-represented employees early in the program before us. Therefore, the court found "that the present dispute is a minor dispute within the exclusive jurisdiction of the NRAB." Bhd. of Airline, Ry. & Steamship Clerks v. Atchison, T. & S.F. Ry., No. 86 C 3793, slip op. at 12. We agree.
 
 
 16
 BRAC relies heavily on three cases: Int'l Ass'n of Machinists, District Lodge No. 19 v. Soo Line R.R., No. 4-86-353, slip op. (D.Minn. Aug. 13, 1986) , aff'd, 833 F.2d 730 (8th Cir.1987) vacated, reh'g granted, en banc, 127 L.R.R.M. (BNA) 2485 (8th Cir.1988); Southern Pac. Transp. v. Bhd. of Ry., Airline & Steamship Clerks, 636 F.Supp. 57 (D.Utah 1986); and Bhd. of Ry., Airline & Steamship Clerks v. Chesapeake & O. Ry., 115 L.R.R.M. (BNA) 3635 (N.D. Ohio 1983). We find those decisions to be inapposite. In each of the cases cited by BRAC, a federal district court held that a buyout program similar to the one before the court gave rise to a major dispute and awarded BRAC a preliminary injunction barring implementation of the program. However, in none of those cases did the employer-railroad offer sufficient evidence of an established past practice to support a nonfrivolous claim of contractual justification. See, e.g., Southern Pac. Transp., 636 F.Supp. at 60 (evidence of past practice insufficient); Chesapeake & O. Ry., 115 L.R.R.M. at 3639-40 (evidence of past practice insufficient). In contrast, when a carrier has produced evidence that a buyout program was consistent with an established past practice, the court has held that the plan engendered only a minor dispute, properly decided by the NRAB. Int'l Ass'n of Machinists v. Illinois Central Gulf R.R., No. 84 5179, slip op. at 4 (S.D.Ill. Dec. 17, 1984)
 
 
 17
 Of the three cases relied upon by BRAC, only the Chesapeake & O. Ry. case sets forth a thorough discussion of the employer's past practices allowing us to make a direct comparison with the case before us.[3] See Chesapeake & O. Ry., 115 L.R.R.M. at 3639-40 (discussing past-practice evidence). In that case, the employer-railroad attempted to justify its buyout offers by showing that it unilaterally had implemented voluntary programs of stock ownership, military leave, and scholarships for employees' children, all without union protest. The carrier also produced evidence that it had offered lump-sum severance pay in exchange for resignations by management employees. The court found that the evidence did not sufficiently support the carrier's claim of an established past practice to render the dispute minor. The earlier voluntary benefits to union-represented employees were "unrelated to defendant's expedited attrition plan" and the union did not represent management employees and thus "lack[ed] standing to object" to the management employees' buyout offers. Id. at 3640. In short, the conduct offered by the railroad as evidence of an established past practice was too dissimilar to the current practice to support a finding that the current practice was a part of the parties' course of dealing.
 
 
 18
 As the district judge in this case noted, the facts here demonstrate a much closer relationship between the past-practice evidence and the challenged current practice. Bhd. of Airline, Ry. & Steamship Clerks v. Atchison, T. & S.F. Ry., slip op. at n. 8 (distinguishing Chesapeake & O. Ry.). Here, Santa Fe produced evidence that it offered cash payments in exchange for resignations by BRAC-represented employees on two separate occasions before instituting this plan, and that BRAC acquiesced in those offers. Moreover, Santa Fe offered evidence that BRAC officials cooperated with the same plan they now challenge, both by acting as witness on resignation forms and by personally taking advantage of the plan. Santa Fe's evidence of past practice thus arguably would support a finding that the union acquiesced in this very plan, as well as the similar post-merger program. This evidence of past practice is far stronger than that offered by the railroad in Chesapeake & O. Ry.
 
 
 19
 In sum, we agree with the district court that the evidence in this case supports a nonfrivolous claim that the Santa Fe buyout program was consistent with a mutually understood course of dealing between BRAC and Santa Fe. We therefore hold that this dispute is minor and must be resolved by the NRAB. Of course, whether the evidence is sufficient to establish an enforceable, contractual obligation is a question solely for the NRAB. On that question, we express no opinion. See Norfolk & W. Ry., 833 F.2d at 707 (court's jurisdictional finding does not address the merits of contractual justification claim).
 
 II
 Jurisdiction Over RLA Violations
 
 20
 As an alternative basis for jurisdiction, BRAC alleges that Santa Fe's unilateral institution of the buyout program violated specific provisions of the Railway Labor Act, specifically, section 152, paragraphs Second, Third, Fourth, and Seventh. See 45 U.S.C. Sec. 152, p p Second, Third, Fourth, Seventh. Section 152, paragraph Third gives the parties the right to choose their collective bargaining representatives, while section 152, paragraph Fourth bars carriers from interfering with the organization of their employees. BRAC contends that Santa Fe violated those provisions by dealing directly with employees during the buy-out program, rather than negotiating with BRAC. See 45 U.S.C. Sec. 152, p p Third, Fourth. Section 152, paragraph Second requires carriers and unions to bargain together over all disputes, and section 152 Seventh forbids any change in "pay, rules, or working conditions" without following statutory procedures. BRAC contends that Santa Fe violated those rules by instituting the buy-out program unilaterally, outside the statutory procedure. See 45 U.S.C. Sec. 152.
 
 
 21
 557p Second, Seventh. BRAC argues that its allegations of specific RLA violations create jurisdiction in the district court wholly independent of whether the dispute is major or minor.
 
 
 22
 BRAC correctly asserts that a federal court may exercise jurisdiction over violations of the Railway Labor Act without regard to the court's characterization of the dispute as major or minor--at least in some instances. Compare Ry. Labor Executives' Ass'n v. Boston & Maine Corp., 808 F.2d 150, 158 (1st Cir.1986) (claim of RLA violation basis for federal court's jurisdiction); with Int'l Ass'n of Machinists v. Alaska Airlines, 813 F.2d 1038, 1040 (9th Cir.1987) (exercise of jurisdiction due to alleged RLA violations limited to "exceptional circumstances"). Because this is an independent basis for jurisdiction, BRAC is also correct when it argues that the district court should have addressed this issue separately, rather than resting its decision solely on the ground that the dispute before it was minor. See, e.g., Alaska Airlines, 813 F.2d at 1039-40; Boston & Maine Corp., 808 F.2d at 156-58; Airline Pilots Ass'n, Int'l v. United Airlines, 642 F.Supp. 838, 840-43 (N.D.Ill.1986). However, because federal courts' jurisdiction over alleged RLA violations is not so broad as BRAC argues, we affirm the decision of the district court and hold that this dispute falls within the exclusive jurisdiction of the NRAB.
 
 
 23
 The scope of federal courts' jurisdiction over RLA violations is limited to "exceptional circumstances requiring judicial intervention." Alaska Airlines, 813 F.2d at 1040. The Supreme Court has ruled that a district judge may exercise jurisdiction over RLA violations if the NRAB lacks an appropriate remedy, leaving a party's statutory rights "unsupported by any legal sanction." Switchmen's Union of N. Am. v. Nat'l Mediation Bd., 320 U.S. 297, 300, 64 S.Ct. 95, 97, 88 L.Ed. 61 (1943) (citing Virginia Ry. v. Sys. Fed'n No. 40, Ry. Employees Dep't of the Am. Fed'n of Labor, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); Texas & N. O. Ry. v. Bhd. of Ry. and Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034 (1930)). Thus, in Texas & N. O. Ry., the Court held that a federal district court properly enjoined a railroad from forming a company union and from intimidating its employees to join that union. Because the RLA specifically granted railroad employees the right to choose their representatives " 'without interference, influence, or coercion' " by the railroad, an injunction was appropriate. Texas & N. O. Ry., 281 U.S. at 567-70, 50 S.Ct. at 432-33 (quoting RLA section 2, paragraph Third, currently at 45 U.S.C. Sec. 152, p Third). In Virginia Ry., the Court held that a railroad's statutory duty to bargain with the certified representative of its employees also was enforceable by injunction. Virginia Ry., 300 U.S. at 549-53, 57 S.Ct. at 600-02. In these cases, federal courts had jurisdiction to enjoin the employers' conduct because injunctions were necessary to carry out the purpose of the RLA. Without such relief, the railroads involved could have flouted their statutory duties to the unions. Switchmen's Union, 320 U.S. at 300, 64 S.Ct. at 96. But federal courts should intervene only where they are required to act in order that they might prevent a party's statutory rights from becoming illusory. In those disputes in which the RLA's extrajudicial dispute-resolution mechanisms are capable of adequately protecting the rights of the parties, federal courts may not interfere with the statutory process. Id. at 301-07, 64 S.Ct. at 97-100; see also Gen. Comm. of Adjustment of the Bhd. of Locomotive Eng'rs for the Missouri-K.-T. R.R. v. Missouri-K.-T. R.R., 320 U.S. 323, 332-38, 64 S.Ct. 146, 150-53, 88 L.Ed. 76 (1943) (district court was without jurisdiction to hear jurisdictional dispute between two crafts, properly decided by the Mediation Board).
 
 
 24
 In keeping with the approach of the Supreme Court, lower federal courts have stressed that their jurisdiction over RLA violations is quite narrow. See, e.g., Alaska Airlines, 813 F.2d at 1040; Indep. Union of Flight Attendants v. Pan Am. World Airways, 789 F.2d 139, 141-42 (2d Cir.1986); Air Line Pilots Ass'n, Int'l v. Texas Int'l Airlines, 656 F.2d 16, 19-24 (2d Cir.1981); Air Line Pilots v. United Airlines, 642 F.Supp. at 841-43; Int'l Bhd. of Teamsters v. Pan Am. World Airways, 607 F.Supp. 609, 613-14 (E.D.N.Y.1985); Local Union 808, Int'l Bhd. of Teamsters v. P & W R.R., 576 F.Supp. 693, 702-03 (D.Conn.1983). The courts' reluctance to expand their jurisdiction is particularly well founded where, as here, the employer argues that its actions are allowed by a collective bargaining agreement. When an employer-carrier answers a charge that it has violated the RLA by proferring a defense of contractual justification, a court must address the merits of the dispute to determine jurisdiction. (Does the collective bargaining agreement allow the action taken?) Boston & Maine Corp., 808 F.2d at 158; see also Int'l Ass'n of Machinists v. Northwest Airlines, 673 F.2d 700, 710-12 (3d Cir.1982). Answering the question of jurisdiction therefore requires the court to interpret the parties' collective bargaining agreement. Because the RLA confers that duty on the NRAB, we hesitate to intrude unless action by a federal court clearly is required. See Alaska Airlines, 813 F.2d at 1040 (declining to exercise jurisdiction over allegation of statutory violation which might be resolved by interpretation of collective bargaining agreement); see also Air Line Pilots v. Texas Int'l Airlines, 656 F.2d at 19-24 (discussing limited role of courts in enforcing the RLA); Air Line Pilots v. United Airlines, 642 F.Supp. at 841-42 (courts should defer where contractual interpretation is at issue); Teamsters v. Pan Am. World Airways, 607 F.Supp. at 612-13 (dispute over contractual interpretation makes court's jurisdiction "doubtful"); Teamsters v. P & W R.R., 576 F.Supp. at 702-03 (judicial restraint appropriate where issues can be settled by adjustment board). Considering our limited role in enforcing the RLA, our review of the cases in which allegations of RLA violations resulted in judicial intervention convinces us that those decisions are inapplicable here.
 
 
 25
 In some instances, a court may exercise jurisdiction over disputes arising before a union has been certified as the representative of the employees involved. For example, in Conrad v. Delta Airlines, 494 F.2d 914 (7th Cir.1974), this circuit held that a district court should have exercised jurisdiction to hear the complaint of an employee who allegedly was discharged in retribution for engaging in RLA-protected union-organizing activities. Conrad, 494 F.2d at 917-18. Because the airline discharged the plaintiff before the union was certified, the plaintiff could avail himself of neither union representation nor an administrative hearing. The Ninth Circuit addressed a similar problem and held that jurisdiction was established in Burke v. Compania Mexicana de Aviacion, 433 F.2d 1031 (9th Cir.1970). In both Conrad and Burke, the timing of the discharges was crucial. Because the plaintiffs were discharged before the unions were certified, the RLA's dispute-resolution mechanism could not address their claims. Alaska Airlines, 813 F.2d at 1040 (discussing Conrad and Burke ).
 
 
 26
 Cases in which federal courts have held that jurisdiction was established to hear post-certification disputes also do not support jurisdiction here. One such decision, Brady v. Trans World Airlines, 401 F.2d 87 (3d Cir.1969), resembles the pre-certification cases in its rationale. In Brady, an employee sued both his union and his employer after he allegedly was fired for refusing to pay his union dues. For the plaintiff to have pursued his case before an adjustment board made up of representatives of the carrier and the union would have been futile; the very parties against whom he proceeded would decide the question. Id. at 97. Thus, "the existing Board of Adjustment was incapable of rendering a fair disposition of the grievances at issue." Northwest Airlines, 673 F.2d at 708 (discussing Brady ). As in the pre-certification cases, the administrative procedure available under the RLA appeared very unlikely to provide a meaningful remedy to the plaintiff.
 
 
 27
 Three other post-certification cases holding jurisdiction established, Boston & Maine Corp., 808 F.2d 150; Ruby v. TACA Int'l Airlines, 439 F.2d 1359 (5th Cir.1971); and Bhd. of Ry. Trainmen v. Central of Georgia Ry., 305 F.2d 605 (5th Cir.1962), also involved facts too different from those before us to support BRAC's jurisdictional argument. In Central of Georgia Ry., a union charged that the railroad had instituted an investigation of the chairman of its grievance committee for the specific purpose of discrediting both the individual and the union. Central of Georgia Ry., 305 F.2d at 606-07. In effect, the union alleged that the railroad intended "to destroy the process of collective bargaining and resolution of grievances by wrongfully destroying the effectiveness of the chosen representative." Id. at 608. Because the union failed to rebut that allegation except in its "bare bones pleadings," the court held jurisdiction established. Id. at 609-10.
 
 
 28
 In Ruby, a union sought to enjoin an airline from moving its pilot base to El Salvador. Under Salvadorean law, the union would no longer be recognized as the representative of the pilots and the collective bargaining agreement between the airline and the union would be nullified. Ruby, 439 F.2d at 1360-61. The court rejected the airline's argument that the move was authorized by the agreement. While the agreement might have contemplated transferring individual pilots, it could not "reasonably be read to authorize a full-scale unilateral transfer, with the attendant consequences for [the union] and the agreement as a whole." Id. at 1364. In fact, during negotiation of the agreement at issue, the pilots specifically had expressed concern that "the carrier would use the runaway shop technique to defeat the pilots' collective bargaining gains." Id. at 1363-64. Therefore, the court held that the proposed move constituted both a major dispute and a "patent violation" of the RLA, so the district court had jurisdiction to enjoin the move. Id. at 1364.
 
 
 29
 Finally, in Boston & Maine Corp., a union alleged that a railroad had abolished the jobs of employees who had refused to cross picket lines. Because such a refusal is protected by the RLA, the employer's retaliatory abolishment of the jobs violated the RLA. The court characterized the railroad's defense of contractual justification as a "red herring." Although the collective bargaining agreement allowed abolishment of jobs, no reasonable construction of the contract could allow job abolishments to target specifically those workers who had engaged in protected activities. Boston & Maine Corp., 808 F.2d at 157-58. Because the railroad failed to rebut the charge that the job abolishments were retaliatory, a district court had jurisdiction to enjoin them. Id. at 158-59.
 
 
 30
 As we read the cases allowing federal courts to assert jurisdiction over alleged RLA violations, they can be divided roughly into two groups.[4] One group provides jurisdiction in cases in which the extrajudicial dispute-resolution framework of the RLA is either unavailable, see Conrad, 494 F.2d 914; Burke, 433 F.2d 1031, or ineffective. See Brady, 401 F.2d 87. These cases fit comfortably within the language and rationale of the Supreme Court cases that invoke the jurisdiction of federal courts where statutory rights otherwise would be "unsupported by any legal sanction." Switchmen's Union, 320 U.S. at 300, 64 S.Ct. at 97. Here, however, BRAC was the certified representative of the employees affected by the buyout program at all relevant times. The administrative channels provided by the RLA were available to resolve this dispute, so neither Conrad nor Burke is persuasive. See Northwest Airlines, 673 F.2d at 707 n. 6, 708. Similarly, BRAC fails to allege that pursuit of its claim before the NRAB would prove futile; therefore, Brady is also inapposite. Id. at 708.
 
 
 31
 The second group of cases allows federal jurisdiction over disputes that involve actions taken by an employer with specific intent to weaken or destroy a union--anti-union animus, in the parlance of labor law. See, e.g., Boston & Maine Corp., 808 F.2d 150 (jobs abolished in retaliation for engaging in protected activities); Ruby, 439 F.2d 1359 (runaway shop threatened to nullify collective bargaining agreement); Central of Georgia Ry., 305 F.2d 605 (discharge in retaliation for engaging in protected activities). BRAC has alleged no such motive on Santa Fe's part, so these cases, too, are inapplicable here. BRAC does argue that the Santa Fe program ultimately will have the effect of weakening the union because Santa Fe took action unilaterally, rather than bargaining with BRAC. However, "[t]his roundabout effort to reach a statutory violation is not a sufficient ground for a court to assume jurisdiction." Alaska Airlines, 813 F.2d at 1040-41. At the least, this group of cases requires that a union seeking judicial resolution of its complaint "allege that the defendant is engaged in a general campaign or effort to destroy or undermine the union's representation of its members." Northwest Airlines, 673 F.2d at 711 (interpreting Central of Georgia Ry.). Because BRAC fails to allege anti-union animus, these cases do not require a federal court to exercise jurisdiction here.[5]
 
 
 32
 In summary, Santa Fe has produced sufficient evidence of an established past practice to render this dispute minor, thus within the exclusive jurisdiction of the NRAB. Moreover, BRAC fails to allege either that the statutory dispute-resolution process cannot properly address its claim or that Santa Fe seeks to destroy the union through the buyout program. We find no basis for asserting jurisdiction over the subject matter of this dispute. The decision of the district court is
 
 
 33
 AFFIRMED.
 
 
 
 [1]
 A third rationale also may allow a court to exercise jurisdiction and to issue an injunction in disputes arising under the RLA. A court may enjoin employer actions that engender only minor disputes if the delay in obtaining an NRAB decision will result in irreparable harm to employees. "If this be so, the action of the district judge, rather than defeating the Board's jurisdiction, would operate to preserve that jurisdiction by preventing injury so irreparable that a decision in the union's favor would be but an empty victory." Bhd. of Locomotive Eng'rs v. Missouri-K.-T. R.R., 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960). This sort of injunction does not amount to a decision on the merits and does not interfere with the NRAB's consideration of the matter. Id. BRAC does not seek temporary injunctive relief pending an NRAB decision, however, but instead asks that a federal court address the dispute on the merits
 
 
 [2]
 Past-practice evidence generally will not be admitted to contradict the express provisions of a written contract. Norfolk & W. Ry., 833 F.2d at 705 n. 4 (discussing National Ry. Labor Conference v. Int'l Ass'n of Machinists, 830 F.2d 741 (7th Cir.1987); Bhd. of Ry. Carmen v. Norfolk & W. Ry., 745 F.2d 370 (6th Cir.1984)). However, where, as here, the parties' written agreement is silent regarding the disputed practice, evidence of a course of dealing may be instructive. Id
 
 
 [3]
 In Soo Line R.R., the parties apparently did not debate whether an established past practice allowed the railroad's buyout program. Neither the circuit court nor the district court discussed any evidence of past practices. Soo Line R.R., 833 F.2d 730; Soo Line R.R., No. 4-86-353, slip op. In Southern Pac. Transp., the court found that evidence of previous buyouts failed to demonstrate enough "continuity, mutual intent and understanding, purpose, and knowledge ... or acquiescence" to demonstrate an arguable past practice. However, because the court failed to describe the evidence before it; therefore, we cannot meaningfully compare that case to this one. Southern Pac. Transp., 636 F.Supp. at 60
 
 
 [4]
 We have imposed this structure on the caselaw for analytical purposes only. The groups are not mutually exclusive. For example, Conrad and Burke, which we place in the first group, resemble the cases in the second group in that they involved employer conduct that demonstrated anti-union animus. See Conrad, 494 F.2d at 917-18 (discharge in retaliation for union-organizing activities); Burke, 433 F.2d at 1032-34 (same). And Ruby, which we place among the "anti-union animus" cases, can be discussed as a case in which NRAB adjudication would be ineffective. In Ruby, only an injunction could prevent the employer-airline from carrying out its plan to move its pilot base and only a federal court could issue such an injunction. See Alaska Airlines, 813 F.2d at 1040 (interpreting Ruby ). The exact makeup of the groups is not crucial here, however. The important point is that no federal court has exercised jurisdiction over alleged RLA violations unless the plaintiff has shown either that the statutory dispute-resolution mechanism would be ineffective in addressing the dispute, or that the carrier-employer has acted with anti-union animus, or both. BRAC alleges neither, but merely asserts generally that RLA violations may be resolved by federal courts. BRAC's reading of the applicable caselaw is overly broad; the argument fails
 
 
 [5]
 We do not mean to imply that the mere allegation of anti-union animus necessarily provides a federal court with jurisdiction to hear an otherwise minor dispute. See Northwest Airlines, 673 F.2d at 711-12 (suggesting procedure for determining jurisdiction); and cf. Flight Attendants v. Pan Am. World Airways, 789 F.2d at 141-43 (bare allegation of anti-union animus insufficient); Air Line Pilots v. United Air Lines, 642 F.Supp. at 841-42 (evidence of anti-union animus insufficient to support jurisdiction over minor dispute); Teamsters v. Pan Am. World Airways, 607 F.Supp. at 613-14, n. 5 (evidence of anti-union animus did not support jurisdiction over minor dispute; doctrine of anti-union animus "has limited application outside the context of representational disputes"); Teamsters v. P & W R.R., 576 F.Supp. at 702-03 (claim of anti-union animus can be resolved by administrative means; judicial restraint required). We need not decide today how a court should address the question of jurisdiction over disputes that arise out of allegations of anti-union animus. We hold only that because BRAC does not allege that Santa Fe acted with anti-union animus, Central of Georgia Ry., 305 F.2d 605; Ruby, 439 F.2d 1359; and Boston & Maine Corp., 808 F.2d 150, do not support BRAC's position