In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-1563

BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN
(GENERAL COMMITTEE OF ADJUSTMENT, CENTRAL REGION), *et
al.*,

*Plaintiffs-Appellants*,

*v.*

UNION PACIFIC RAILROAD COMPANY,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 2730 — **Edmond E. Chang**, *Judge*.

_____

ARGUED SEPTEMBER 14, 2017 — DECIDED NOVEMBER 17, 2017
AS AMENDED ON PETITION FOR REHEARING JANUARY 11, 2018

_____

Before WOOD, *Chief Judge*, and RIPPLE and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Labor-management relations in the railroad industry have been subject to a distinctive regulatory regime ever since the Railway Labor Act (RLA or Act) took effect in 1926. See 45 U.S.C. §§ 151–88. No one wants to see the

nation's transportation network brought to a standstill because of labor conflict. The RLA therefore is designed to substitute bargaining, mediation, and arbitration for strikes.

Embedded in the Act is a strong preference for arbitration, as opposed to judicial resolution of disputes. If a disagreement arises over the formation or amendment of a collective bargaining agreement (CBA), it is considered a "major" dispute under the Act, and it must be decided by a court. See *Consolidated Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302–03 (1989). If, on the other hand, it relates only to the interpretation or application of an existing agreement, it is labeled "minor" and must go to arbitration. *Id.* at 303. In the case before us, the Union Pacific Railroad (the Railroad) issued a modified disciplinary policy for its engineers without first sitting down at the bargaining table with their union, the Brotherhood of Locomotive Engineers and Trainmen (the Union). The Union argues that the Railroad could not take this step before bargaining and that its unilateral action violates the RLA. It also contends that the dispute itself is a major one not suitable for arbitration.

Observing that the playing field is tilted heavily in favor of arbitration, the district court agreed with the Railroad that the dispute is minor, and it accordingly dismissed the lawsuit in favor of arbitration. Although the Union has made a number of good points, we conclude that there is at least a non-frivolous argument that interpretation of the agreement between the parties, not change, is at stake. We therefore affirm the district court's decision dismissing the suit for lack of subject-matter jurisdiction.

**I**

Our summary of the underlying facts can be brief. The Brotherhood of Locomotive Engineers and Trainmen is composed of three unions that represent engineers employed by the Railroad, which is itself an amalgamation of several former railroad carriers. As a result, the Railroad is a party to multiple overlapping CBAs with different groups of employees.

The current dispute originates from the Railroad's decision in 2015 to modify a set of disciplinary rules; the new policy was set forth in something called MAPS, which stands for Managing Agreement Professionals for Success. Before that time, the same subset of the Union's members was subject to disciplinary rules originating from several sources. One is a written agreement referred to as the 1996 System Agreement-Discipline Rule. Another is a mid-1990s agreement, known as UPGRADE. The parties do not agree on the genesis of UPGRADE, but the record indicates that it was developed with input from both labor and management. In the years before 2015, the Railroad made several changes to its disciplinary policies over the Union's objections. When it shifted to MAPS it again did not consult the Union. Around the time MAPS was being rolled out, however, the Railroad polled members of the Union about what changes they would like to see in the existing disciplinary rules.

Another subset of the Union's members is party to an agreement called the 1995 Southern Pacific Agreement, a CBA that also establishes disciplinary rules. The Railroad became subject to this agreement when it absorbed the former Southern Pacific Western Lines.

## II

The RLA allows employers to use either of two methods for changing "rates of pay, rules, or working conditions of [] employees": first, they may act in any way permitted by an existing CBA; or second, they may go through the bargaining and negotiation procedure prescribed in section 156 of the Act. See 45 U.S.C. § 152 Seventh. In other words, the central topics of rates of pay, rules, and working conditions are subject to mandatory bargaining. Both parties agree that MAPS is a disciplinary policy that falls within the scope of "rules" and "working conditions" and is thus subject to these limits.

The Union sees this case as straightforward, in its favor. Since MAPS is subject to RLA section 152 Seventh and it was implemented without going through the section 156 procedures, the Union reasons, the Railroad changed a mandatory subject of bargaining without the necessary participation of the Union. But matters are not that simple. Critically, the Union overlooks the fact that even in the absence of negotiation, changes are permitted if authorized by contract. For the same reason, the primary case on which the Union relies is inapposite. That case holds that the courts, rather than arbitrators, are the proper forum for cases in which a carrier unilaterally changes conditions of employment. See *Airline Pilots Ass'n Int'l. v. Nw. Airlines, Inc.*, 199 F.3d 477, 479–80 (D.C. Cir. 1999) (airline industry, to which the RLA also applies). But a change is "unilateral" only if it was accomplished without contractual authority; if it is made under the aegis of a contract, it would not (by definition) be unilateral. Thus, *Airline Pilots* is helpful to the Union only if we find that the present dispute lies outside the boundaries of the agreements between it and the Rail-

road. If it is covered somehow by those agreements, any disputes concerning MAPS are properly characterized as minor and must be taken to an arbitrator.

Before moving to the relevant contractual issues, we must briefly change tracks. The Railroad also offers a simple way to resolve the case before us: silence in the CBA, it insists, is enough to give the carrier carte blanche. We cannot accept such a sweeping proposition. First, such a rule cannot be squared with the RLA. There is no ambiguity in the statute: any change to pay, rules, or conditions must be authorized by contract or as the result of bargaining. The Railroad tries to avoid the plain language of the statute by pointing to past arbitration awards that have found, in particular situations, that contractual silence equals authority. Even if the awards use this language, however, as a structural matter they cannot support any broad legal proposition. Arbitrators' jurisdiction is strictly limited to interpreting the contract before them, and the force of any decision can go no further than what the contract at issue allows. 45 U.S.C. § 153 First (i). Contractual silence may give carriers freedom to make changes to matters *not* affecting rates of pay, rules, or working conditions. See *Chicago & N.W. Transp. Co. v. Ry. Labor Execs.' Ass'n*, 908 F.2d 144, 151 (7th Cir. 1990). But contract and bargaining are the only options for subjects covered by section 152 Seventh.

The RLA casts federal courts in an unfamiliar role—that of taxonomist—when a railroad carrier claims contractual authority to make changes to one of the mandatory subjects of bargaining. *Bhd. of Maint. of Way Emps. v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 638 (7th Cir. 1997). Whether the court has jurisdiction to resolve the underlying contractual

dispute depends on whether it is "major" or "minor." These are terms of art. *Chicago & N. W. Transp. Co.*, 908 F.2d at 148.

As we indicated earlier, major disputes pertain to the creation of new contracts affecting any mandatory subject of bargaining or modifications of existing contracts that have the same effect. Federal courts have jurisdiction to enjoin a carrier from making that type of change if the change is neither authorized by a CBA nor the result of the statutorily defined bargaining and mediation procedures. *Consolidated Rail*, 491 U.S. at 302–03. The injunction halts the proposed new rule from taking effect and thus preserves the status quo during bargaining. If bargaining is unfruitful, the union may resort to economic self-help. *Id.* at 311. In contrast, minor disputes "aris[e] out of the grievances or out of the interpretation or application of agreements concerning rates of pay, rules or working conditions." 45 U.S.C. § 152 Sixth. Minor disputes are subject to compulsory arbitration before the National Railroad Adjustment Board, leaving federal courts without jurisdiction. *Consolidated Rail*, 491 U.S. at 303–04. Critically, a minor change may take effect immediately, even if it must later be undone by order of the arbitrator.

A primary goal of the RLA is to avoid disruptions to commercial use of the railways. Accordingly, in making the choice between major and minor, there is a large thumb on the scale in favor of minor, and hence arbitration. *Id.* at 310–11. The burden on a railroad to convince the court that its changes are only an interpretation or application of an existing CBA is quite low. If the railroad can articulate an argument that is "neither obviously insubstantial or frivolous, nor made in bad faith," the court lacks jurisdiction to do anything but dismiss the case and allow arbitration to go forward. *Id.* at 310. And

because a CBA, unlike a private contract, is a "generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate," *id.* at 311–12 (internal citation omitted), the major-minor dichotomy treats interpretation or application of express and implied contractual terms indistinguishably. Thus, the relevant terms of an agreement are not only those that are written down; they also include the parties' practice, usage, and custom as they carry out their agreement. *Bhd. of Maint. of Way Emps.*, 138 F.3d at 641.

### III

Better-than-frivolous is a low bar, but a bar nonetheless. Naked assertions of a past practice are not enough. Nor may a railroad lie its way to arbitration. There must be a basis in the record to support the conclusion that the railroad, or the union as the case may be, put the relevant practice into effect. If the union were to produce evidence that foreclosed the carrier's interpretation, it might succeed in showing that the railroad's position is obviously insubstantial. But none of that has occurred here. Union Pacific has come forward with two essential pieces of evidence: (1) CBAs governing disciplinary policy and (2) a history of making pertinent changes in the disciplinary procedures outlined in the governing CBAs.

Some of the disciplinary policies that the parties have been following have their source in a written agreement: the 1996 System Agreement-Discipline Rule, to which the Union refers as UPGRADE. UPGRADE itself was the product of negotiations between the Union and the Railroad. In addition, the Union and the Railroad are parties to other collective bargaining agreements, some of which also cover the subject of discipline. As we noted earlier, these agreements preceded MAPS. Whatever else MAPS may be, therefore, it cannot be seen as a

brand new contract. The existence of these agreements supports a finding that the Union and the Railroad here are at odds not about an implied-in-fact *contract* but rather an implied-in-fact *term* to a contract. That distinguishes this case from those in which a court had to decide whether there was any extant agreement governing the parties' relationship with respect to the contested matter. *Cf. Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (resolving whether the parties' arbitration clause had been properly ratified by the time in question); *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 737 (7th Cir. 2010) (resolving whether a document qualified as a contract). Here, we need to see what past practices tell us about any implied terms in the prior agreements.

The Railroad's General Director of Labor Relations submitted a declaration in which he maintained that the Railroad has "implemented and updated various other policies that interface with or related to employee discipline." Phillips Declaration ¶ 9. The Railroad has made "many" changes to UPGRADE itself, including updates to "safety rule violations, adding conference opportunities, and adjusting the severity of the penalty based on employees' unsafe behavior." Phillips Declaration ¶ 10. The Union denies that it ever acquiesced to any such changes to UPGRADE. Bagby Declaration ¶ 14; Hannah Declaration ¶ 35. But the Union does not dispute that historically the Railroad has made changes to the practices covered by the parties' agreement. At oral argument, counsel for the Union conceded that Phillips' declaration accurately represented that pertinent fact. The Railroad's declaration is enough to show that its position is not frivolous, though it may or may not prevail. Wading through the competing declarations to determine the actual authority the Railroad had

to modify the disciplinary policies, based on past practices, is a job for the arbitrator.

The Union argues in the alternative that MAPS must be a change in policy rather than an application of existing contractual authority because it conflicts with the terms of a separate agreement—Article 18 of the Southern Pacific Western Lines Agreement. Article 18 requires the following:

> Information concerning discipline more than five (5) years old contained in personnel records will be expunged with the exception of suspension or dismissal involving violations of [Federal Railroad Administration] regulations or Safety Rules, which were upheld in arbitration.

MAPS imposes a "three-strike" policy that counts prior license revocations as strikes. The Union argues that since MAPS allows the Railroad to escalate punishment based on past license revocations, then license revocations must be "information concerning discipline." Further, since nothing in MAPS distinguishes between revocations more or less than five years old, it contends that MAPS and Article 18 cannot coexist. It concludes that MAPS implements a change in disciplinary policy, not just an interpretation or application of an existing policy, and thus the dispute over its implementation is major.

Again, there is a non-frivolous argument for the compatibility of the two policies. If accepted by an arbitrator, it would lead to the conclusion that MAPS has not changed the prior rules. In the Railroad's view, license revocations fall within Article 18's exception for violations of the Federal Railroad Administration (FRA) regulations. License revocations are a

possible consequence of violating a federal regulation. See 49
C.F.R. § 240.307. Though on its face Article 18's exception
might appear to cover all discipline, matters "upheld in arbi-
tration" could be seen to apply only to violations of safety
rules, as opposed to violations of FRA regulations. The re-
course for an engineer who has had her license stripped is not
arbitration, but rather review by the Locomotive Engineer Re-
view Board. 49 C.F.R. § 240.401(b). It is impossible for a license
revocation ever to be upheld in arbitration.

We stress again that we are not resolving these disputes.
We conclude only that the arguments on the Railroad's side
are better than frivolous. The Union has the right to file a
claim through the usual "minor dispute" procedures, as the
Railroad concedes, and by the same token the Railroad will
have the right to raise any appropriate defenses. It will be up
to the arbitrator to decide which position carries the day.

**IV**

Finally, we address whether the Railroad's direct dealing
with the Union's members violates one of the provisions of
the RLA that confers federal jurisdiction independent of the
major-minor dichotomy. *Bhd. of Ry., Airline & S.S. Clerks,
Freight Handlers, Express & Station Emps. v. Atchison, Topeka &
Santa Fe Ry. Co.*, 847 F.2d 403, 408 (7th Cir. 1988). Direct deal-
ing is one such violation. Nonetheless, jurisdiction is limited
to exceptional circumstances. *Id.* And federal courts should be
particularly wary of finding jurisdiction when the carrier
plausibly understands a CBA to permit its conduct. *Id.* at 409.
Typically, jurisdiction for specific violations of the RLA is con-
fined to cases in which arbitration is an ineffective or unavail-
able remedy or the carrier has been alleged to have intended
to weaken the union. *Id.* at 411.

This is not a case in which arbitration would be ineffective or unavailable. The Railroad had a basis for believing that it was under no obligation to bargain with the Union when it replaced UPGRADE with MAPS. Polling union members about these matters does not significantly undercut the Union's role if the Union's role had been contracted away to begin with. If the Railroad's interpretation is wrong, the arbitrator will tell it so, and it will be compelled to negotiate with the Union. The facts also do not support a finding that the Railroad was out to weaken the Union. All it is alleged to have done is ask union members about their policy preferences. The Union has not pleaded anything extraordinary about this case nor any exceptionally detrimental consequences.

## V

The parties have advanced extreme positions in this case. The Railroad contends that unwritten rules supersede the RLA and it may unilaterally implement disciplinary policies. The Union trivializes a documented history of changes to disciplinary policies—some of which can be found in its own declarations. Neither extreme persuades us. Union Pacific must do very little to show that this dispute is minor. It has passed that low bar and shown that this is a "minor" dispute that qualifies for RLA arbitration. It is time for the courts to bow out and allow that process to go forward. We therefore AFFIRM the judgment of the district court.